781 P.2d 197

STATE of Idaho, Plaintiff–Respondent,

v.

Mark Henry LANKFORD,
Defendant–Appellant.

Nos. 15759, 16192.

Supreme Court of Idaho.

July 10, 1989.

Rehearing Denied Oct. 31, 1989.

Gregory Fitzmaurice, Grangeville, Idaho, for defendant-appellant.

Jim Jones, Atty. Gen. and Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent. Lynn E. Thomas argued.

HUNTLEY, Justice.

On May 4, 1984, Mark Henry Lankford was found guilty on two counts of first degree murder. Following the verdicts, the trial court held a sentencing hearing and sentenced Lankford to death. Lankford appeals the murder convictions and sentence, the denial of his amended petition for post-conviction relief, and the trial court's denial of his second motion for new trial. The appeals have been consolidated pursuant to I.C. § 19–2719 (1987). This matter is also before the Court on automat-

ic review under the provisions of I.C. § 19–2827 (1987).

In June of 1983, Mark Lankford and his brother Bryan Lankford packed their belongings and fled from their home state of Texas because Bryan had violated his probation for a robbery conviction and did not want to be sent back to jail. The Lankfords eventually made their way to Idaho County, Idaho, where they camped in a remote forest campground for several days. At that same time, retired Marine officer Robert Bravence and his wife, Cheryl, were vacationing in a nearby campground.

On September 24, 1983, the bodies of Robert and Cheryl Bravence were found by hunters in the Idaho County forest. Approximately one-fourth of a mile from the bodies a 1982 Chevrolet Camaro registered to Mark Henry Lankford, of Houston, Texas was found. On or about the 5th of July 1983, a vehicle registered to Robert and Cheryl Bravence was located in Los Angeles, California. Fingerprints taken from items found in the Bravence vehicle were identified as belonging to Mark Henry Lankford and Bryan Stuart Lankford.

On October 2, 1983, Mark Lankford and Bryan were arrested in Liberty County, Texas. Subsequent to the arrest, authorities found items belonging to the Bravences in a Liberty County campsite. The Lankfords were extradited to Idaho where they were tried separately for the murders of Robert and Cheryl Bravence. Bryan Lankford agreed to be a witness for the State at his brother's trial because he believed the State Prosecutor had offered him an indeterminate life sentence instead of the death penalty in exchange for his testimony.

Bryan testified as follows: After reaching the Idaho County forest where they hid out, Mark and Bryan decided to steal an automobile from a campsite in the area. They reasoned that, because the monthly payments on Mark's car were delinquent, the police would be searching for it and so they needed to abandon it to avoid capture. They left the car in the woods covered with brush and set off to steal another car.

They walked down a mountain road which eventually led to a campsite occupied by Robert Bravence and his wife Cheryl. Bryan entered the campsite first, with a shotgun draped over his arms, and engaged the Bravences in conversation. Shortly thereafter Mrs. Bravence left the campsite to go down to a nearby stream for some water. After Mrs. Bravence left, Mark Lankford ran out from behind some bushes where he had been hiding, and into the campsite and ordered Robert Bravence to kneel on the ground in front of him. Mark Lankford then hit Robert Bravence in the back of the head with a brown wooden night stick. When Cheryl Bravence returned to the campsite she rushed to the side of her husband who was lying on the ground. Mark Lankford ordered her to kneel down on the ground next to the body of her husband and struck her in the back of the neck with the same nightstick. The Lankfords placed the Bravences' bodies into the Bravence van and drove back to their former campsite where Mark hid the bodies near his Camaro. The Lankfords then drove the Bravence van to Oregon and later to California where they abandoned it in Los Angeles. During their travels they purchased food and accommodations with the Bravences' credit card.

Following Bryan Lankford's testimony on direct examination, Mark Lankford, contrary to advice from counsel and the court, decided to act as his own attorney and cross-examine his brother. After Mark Lankford's inadequate attempt at cross-examination and objection by his attorney, the trial court allowed the attorney to resume his role. At this point, Bryan Lankford invoked his Fifth Amendment privilege and initially refused to answer the trial counsel's questions on cross-examination.

In addition to Bryan Lankford's testimony, pertaining to the causes of death, the State's medical experts testified that the Bravences died from multiple blows to the skull.

After Mark and Bryan were each convicted in separate trials for the first degree murders of Robert and Cheryl Bravence,

Bryan recanted the testimony he gave at Mark's trial on three different occasions. At Mark's sentencing hearing Bryan testified that in a phone conversation he told a reporter with the Lewiston Morning Tribune that he had lied under oath at Mark's trial and that it had been he who had bludgeoned the Bravences, that he used a rock and that Mark Lankford was not present at the scene. Later, at Mark Lankford's motion for a new trial, Bryan Lankford indicated that he had lied to the Lewiston Tribune. Finally, after being sentenced to death, Bryan Lankford executed a written statement in which he indicated his full culpability for the Bravence deaths and Mark's Lankford's innocence. Then on May 29, 1986, at Mark's second motion for a new trial, Bryan testified that he was primarily responsible for the murders. He further testified that his testimony at his brother's trial was false.

On October 15, 1984, the court issued its Findings in Consideration of the Death Penalty. Judgment and sentence of Death was imposed on October 16, 1984.

## I.

### Lankford's Decision to Waive His Right to Counsel and Cross-examine His Brother Pro Se.

■ Mark Lankford claims that he was deprived of his right to counsel as guaranteed by the sixth and fourteenth amendments to the United States Constitution and art. 1, § 13 of the Idaho Constitution when the trial court allowed him to cross-examine his brother pro se. He claims that Idaho case law, *Bement v. State*, 91 Idaho 388, 395, 422 P.2d 55 (1966), and I.C. § 19–857 (1987), mandate that more than a mere affirmative waiver is needed to show that the defendant knowingly and intelligently waived his right to counsel. Lankford claims that the trial court did not conduct the requisite penetrating and extensive examination into all of the circumstances of Lankford's waiver; and, as a result, he was allowed to waive his right to counsel in the heat of passion and without sufficient knowledge of his waiver's potential ramifications.

Criminal defendants have the right to be represented by counsel as guaranteed by the sixth and fourteenth amendments of the United States Constitution and art. I, § 13 of the Idaho Constitution. In addition to guaranteeing the right to counsel, it has been held that the sixth amendment guarantees that a defendant has an independent constitutional right to proceed pro se when he voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806, 812–836, 95 S.Ct. 2525, 2529–2542, 45 L.Ed.2d 562 (1975); *United States v. Harris*, 683 F.2d 322, 324–325 (9th Cir.1982) (the *Harris* court found that the defendant must be aware of the nature of the charges filed against him and the possible penalties flowing from those charges, as well as the dangers and disadvantages of self representation. The *Harris* court also held that the trial court must discuss with the defendant, in open court, whether the defendant's waiver was knowingly and intelligently made, with an understanding of the charges, and possible penalties and dangers of self representation.) *See State v. McCabe*, 101 Idaho 727, 729, 620 P.2d 300 (1980), in which this Court cites *Faretta*.

■ Ultimately, the decision of whether to exercise the right to counsel or proceed pro se is for the defendant to make. The role of the trial court is simply to ensure that where the defendant waives the right to counsel he or she does so knowingly and intelligently.

In this case, the trial court went to great lengths to ensure that Mark Lankford's waiver of his right to counsel was made knowingly and intelligently, and to dissuade Lankford from proceeding pro se. The trial court warned him of the hazards he would encounter, that he had an insufficient background to examine the witnesses, and that he would be held to the Rules of Evidence if he elected to proceed on his own behalf. In spite of these warnings, Lankford insisted on waiving his right to counsel and proceeded pro se during the cross-examination of his brother. In response to Lankford's insistence, the trial court did the only thing it could do—it granted his wish. Even though the trial

court allowed Lankford to proceed pro se, the record reflects the court still protected him as much as it could under the circumstances. It allowed Lankford's counsel to remain present during Lankford's pro se activities; it assisted him on procedural points during his attempt at cross-examination; and finally, it allowed Lankford's attorney to go through an entire recross-examination after Lankford terminated his botched attempt.

We affirm the trial court on this issue.

## II.

### The Trial Court's Instruction That Malice Could Be Established by Proof That the Killing Took Place During the Perpetration or Attempted Perpetration of a Robbery.

Lankford argues that the giving of Instruction No. 24(a) was reversible error. The instruction reads:

The term malice does not necessarily import ill will toward the individual injured, but signifies rather a general malignant recklessness toward the lives and safety of others. Malice may be shown from the fact that an unlawful killing took place during the perpetration or attempted perpetration of the crime of robbery.

■ Lankford claims that this instruction was incorrect in two respects. First, he argues that it states as a matter of law that a killing in perpetration or attempted perpetration of a felony is malice *per se*. Second, he argues the jury could have reasonably interpreted the instruction as creating a presumption that a robbery was committed, thus, relieving the State of its burden of proving beyond a reasonable doubt the existence of a robbery.

As to Lankford's argument that the second sentence of Instruction 24–A misstates the law or is incorrect, we must disagree based upon our reading of Idaho's requirements for the proof of murder in the first degree.

Idaho Code § 18–4001 (1987) provides in part:

18–4001. Murder defined.—Murder is the unlawful killing of a human being with malice aforethought....

Idaho Code § 18–4002 (1987) provides that "such malice may be express or implied." In addition, I.C. § 18–4003(d) (1987) provides:

18–4003(d). Any murder committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary, kidnapping and mayhem is murder of the first degree.

■ Thus, the proof of a murder in the first degree is established in all of its elements by proving (a) the unlawful killing of a human being (b) in the course of a robbery. The requirement of "malice aforethought" is satisfied by the fact the killing was committed in the perpetration of a robbery. In W. La Fave and A. Scott, Jr., *Criminal Law*, § 67 Murder—"Malice Aforethought" and "Living Human Being," pp. 528–530, and § 7 Felony Murder, pp. 545–547 and 554 (1972), the authors explain:

Murder is a common law crime whose complete development required several centuries. Though murder is frequently defined as the unlawful killing of another "living human being" with "malice aforethought," in modern times the latter phrase does not even approximate its literal meaning. Hence it is preferable not to rely upon that misleading expression for an understanding of murder but rather to consider the various types of murder (typed according to the mental element) which the common law came to recognize and which exist today in most jurisdictions:

(1) intent-to-kill murder;

(2) intent-to-do-serious-bodily-injury murder;

(3) depraved-heart murder; and

(4) felony murder.

....

At first the judges in fact did require for murder that the defendant actually have a previously thought-out (i.e., premeditated) intent to kill, though probably the spite, etc., was never actually necessary. Later (about 1550), English statutes

made it murder to intentionally kill another by poisoning or by lying in wait; but these two situations would seem to be no more than typical cases involving a premeditated intent to kill, the almost literal meaning of "malice aforethought."

. . . . .

Thereafter the judges started to invent some new types of murder where there existed no premeditated intent to kill. First of all, when the defendant intentionally killed his victim in a heat of passion aroused in him by the conduct of the victim—the issue being whether the defendant should be guilty of murder or of voluntary manslaughter—the judges decided that manslaughter required that the defendant's passion be reasonable.

. . . . .

Secondly, when the defendant unintentionally killed another person in the commission of a felony—as where A set fire to B's house (arson) and accidentally B or a member of his family was burned to death—the judges held this to be murder ("felony murder"), though the defendant did not intend to kill at all and a fortiori did not premeditate a killing.

. . . .

The judges still continued to say that murder is committed by one who unlawfully kills another "with malice aforethought," now however adding the phrase "express or implied," the word "implied" covering the four situations just described wherein literally there exists no premeditated intent to kill. Modern courts and legislatures still frequently define murder in terms of "malice aforethought, express or implied," by which they mean the same types of murder as those which the English judges ultimately recognized, including felony murder, depraved-heart murder, intent-to-do-serious-bodily-injury murder and murder committed in an unreasonable passion. (The foregoing history is contained in N.Y.State Law Revision Commission, Communication to the Legislature, Legislative Doc. No. 65, 536–540 (1937), reprinted in Hall & Glueck, Criminal Law & Its Enforcement 37–39 (2d ed. 1958). See also Moreland, The Law of Homicide chs. 1–3 (1952); 1 Stephen, A History of the Criminal Law of England (1883).) [1]

Under the facts of the instant case, according to Idaho law, the robbery not only supplies the malice element of the murder charge, but also it makes that murder a murder in the first degree as defined in I.C. § 18–4003(d). Therefore, the instruction was not in error.

As for Lankford's second assignment of error on this instruction, we note that jury instructions must be considered together, without particular weight being given to one as opposed to the others. *State v. Bryan Lankford*, 113 Idaho 688, 694, 747 P.2d 710 (1987). The trial court instructed the jury that the State must prove all elements for crimes charged beyond a reasonable doubt. This defeats Lankford's argument that under Instruction 24(a) the State was not sufficiently obligated to prove robbery beyond a reasonable doubt because the jury was instructed that robbery had to be proven beyond a reasonable doubt. *See State v. Golden*, 67 Idaho 497, 502, 186 P.2d 485 (1947). Because Instruction 24(a) was a correct statement of the law of first degree murder in Idaho and because the court did instruct the jury that it would have to find all the elements of the crimes charged proven beyond a reasonable doubt, we find no error in the language of Instruction 24(a).

### III.

The Trial Court's Decision to Add to the State's List of Aggravating Circumstances and to Deny Lankford's Motion For Continuance.

Lankford claims that the trial court abused its discretion and interfered with his right to counsel when it denied his motion for a continuance to prepare for previously undisclosed aggravating factors

---

**1.** *See* I.C. § 18–4002.

which the trial court added to the prosecution's proposed list of factors. The two factors added were factors enumerated in I.C. § 19-2515(g)(2) (commission of multiple murders) and I.C. § 19-2515(g)(7) (felony murder accompanied with the specific intent to cause the death of a human being).

 While a decision to grant or deny a continuance generally rests within the discretion of the trial judge, the discretion is abused when it results in the abridgment of the accused's right to counsel. *State v. Brown*, 98 Idaho 209, 560 P.2d 880 (1977). In essence, Lankford's argument is that defense counsel had no prior notice that the trial court was going to add two aggravating factors to the list presented by the prosecutor and that lack of notice, combined with the trial court's denial of his motion for a continuance, effectively abridged Lankford's right to counsel, thereby violating his rights under the sixth amendment to the United States Constitution and his rights under art. I, § 13 of the Idaho Constitution. Since the Idaho statute supplies the two subject aggravating factors, the district judge was required to give them consideration if circumstances were proven to support them.

This Court has acknowledged that I.C. § 19-2515(f) (1987) gives fully sufficient notice of the circumstances under which the death penalty may be imposed and of the prerequisites governing such sentence. *State v. Bryan Lankford*, 113 Idaho 688, 747 P.2d 710 (1987). *See also Lockett v. Ohio*, 438 U.S. 586, 597, 98 S.Ct. 2954, 2961, 57 L.Ed.2d 973 (1978) (wherein the court held that a statute gives fair warning of capital liability for an aider and abettor); and *Dobbert v. Florida*, 432 U.S. 282, 298, 97 S.Ct. 2290, 2300, 53 L.Ed.2d 344 (1977), wherein the court held that the existence [of a death penalty statute] on the statute books provides fair warning as to the degree of culpability which the state ascribes to the act of murder). In light of both Idaho and United States Supreme Court rulings, the fact that the aggravating circumstances are documented in I.C. § 19-2515(f) provided Lankford with the requisite notice.

Not only do the statutes provide sufficient notice of aggravating circumstances, but Idaho's sentencing system provides that the judge, not the prosecuting attorney, is responsible for sentencing. *State v. Bryan Lankford*, 113 Idaho 688, 747 P.2d 710, *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983) *cert. den.*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). Because Idaho provides for judge sentencing, a prosecuting attorney's sentencing recommendations are to be viewed as just that, mere recommendations. The trial judge makes the final decision as to what will be and will not be considered in sentencing. Finally, I.C. § 19-2515(d) provides that "[e]vidence admitted at trial shall be considered and need not be repeated at the sentencing hearing."

Lankford had notice of all possible aggravating circumstances and that the judge could properly utilize any or all of them during sentencing. Thus, we find no error and affirm the trial court on this issue.

## IV.

### Sentencing—Participation of Jury.

 Lankford asserts that the imposition of the death penalty with no participation by the jury in the sentencing process violates the Idaho Constitution.

In *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), this Court ruled:

> In 1983 this Court held "that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states." *State v. Creech*, 105 Idaho 362, 373, 670 P.2d 463, 474 (1983) *cert. den.* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). *See also State v. Sivak*, 105 Idaho 900, 902, 674 P.2d 396, 398 (1983) *cert. den.* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887, (1984); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985) *cert. den.*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986);

*State v. Fain,* [116 Idaho 82, 774 P.2d 252 (1989)]. In 1984 the United States Supreme Court upheld death sentencing by trial judges. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

This Court has also held "that Art. 1, § 7, of the Idaho Constitution does not require the participation of a jury in the sentencing process in a capital case." *Sivak,* 105 Idaho at 904, 674 P.2d at 400. *See also Fain,* [116 Idaho 82, 774 P.2d 252] (1989).

Jaimi [Charboneau] contends that despite these decisions, since I.C. § 19–2515(g) "links an enhanced punishment to specific enumerated factual findings," it "usurps the jury's fundamental role in deciding whether the fact is so." In *Richmond v. Arizona,* 434 U.S. 1323, 98 S.Ct. 8, 54 L.Ed.2d 34 (1977) Justice Rehnquist, sitting as a circuit justice, denied an application for suspension of an order denying certiorari or, in the alternative, for a stay of execution. In his opinion Justice Rehnquist stated:

> Applicant raises a second argument in his petition for rehearing that was not raised either before the Arizona Supreme Court or in his earlier petition for certiorari. Applicant argues that the Arizona statute violates the Sixth, Eighth, and Fourteenth Amendments in failing to provide for jury input into the determination of whether aggravating and mitigating circumstances do or do not exist. Such jury input would not appear to be required under this Court's decision in *Proffitt* [*v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)].

434 U.S. at 1325, 98 U.S. at 9, 54 L.Ed.2d at 36. Jaimi correctly points out that this issue was not presented to the entire Supreme Court, but only to Justice Rehnquist. Jaimi argues that *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) supports his position on this issue. It is interesting that Justice Rehnquist also wrote the opinion for the Court in *McMillan,* including the statement "that there is no

Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." 477 U.S. at 88, 106 S.Ct. at 2420, 91 L.Ed.2d at 76. In his decision Justice Rehnquist cited *Proffitt* for the proposition: "Sentencing courts necessarily consider the circumstances of an offense in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to the crime,...." 477 U.S. at 88, 106 S.Ct. at 2420, 91 L.Ed.2d at 76. The crux of the decision in *McMillan* was the conclusion that the fact at issue there—visible possession of a firearm—was not an element of the crimes for which the defendants were convicted, but were instead "a sentencing factor that comes into play only after the defendant has been found guilty...." *McMillan,* 477 U.S. at 84, 106 S.Ct. at 2416, 91 L.Ed.2d at 72. That is how we view the aggravating circumstances listed in I.C. § 19–2515(g).

To accept Jaimi's argument that the jury must be involved in determining whether aggravating circumstances exist, we would have to conclude that the aggravating circumstances listed in I.C. § 19–2515(g) are elements of first degree murder. We are unable to reach that conclusion. The circumstances listed in the statute are clearly circumstances to be considered in sentencing and not elements of first degree murder. It is not unconstitutional for a judge, instead of a jury, to determine whether any of the aggravating circumstances listed in the statute exist.

Our opinion in this aspect of the case is not changed by the decision of the Ninth Circuit in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988). In *Adamson* the Ninth Circuit held Arizona's death penalty sentencing statutes to be in violation of the sixth amendment. During reargument of this case to determine what impact *Adamson* might have on our opinion here, the solicitor general for the state of Idaho acknowledged that there is no significant difference between the Arizona death penalty sentencing statutes and

those of Idaho. Nevertheless, we are not convinced that *Adamson* correctly states the requirements of the sixth amendment on this issue.

Judicial sentencing in capital cases does not violate the sixth amendment. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). *Adamson* attempts to distinguish *Spaziano* on the ground that in *Spaziano* "the Court never reached the particular contention *Adamson* has raised: that Arizona's capital sentencing statute requires the judge to determine elements of the offense charged, thereby taking this factual element out of the jury's hands in violation of the Sixth Amendment." 865 F.2d at 1028. We disagree.

In *Spaziano* the Court noted that the Florida capital sentencing statute that was at issue directed the sentencing judge "to determine whether statutory aggravating circumstances were outweighed by statutory mitigating circumstances." 468 U.S. at 450 n. 4, 104 S.Ct. at 3157 n. 4, 82 L.Ed.2d at 343 n. 4. The Florida statute was similar in the important aspects to those portions of I.C. § 19–2515 relating to death penalty sentencing. The Florida statute provided that the sentencing judge should weigh the aggravating and mitigating circumstances. If the judge imposed a sentence of death, the judge was required to set forth in writing "findings upon which the sentence of death is based as to the facts: (a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and (6) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances." 1972 Fla.Laws, ch. 72–724, Sec. 921.-141(3)(b). The aggravating circumstances enumerated in the Florida law at issue in *Spaziano* were similar in some respects to those contained in I.C. § 19–2515(g). Significantly, one of the aggravating circumstances in Florida was: "The capital felony was especially heinous, atrocious, or cruel." 1972 Fla. Laws, ch. 72–724, Sec. 921.141(6)(h). This is substantially the same as I.C. § 19–2515(g)(5) that is at issue here, ex-

cept that our statute adds the qualifying phrase, "manifesting exceptional depravity."

The Florida Supreme Court noted in its decision "the trial judge found that the circumstances of the offense were especially heinous, atrocious, and cruel, and secondly, found that the defendant was previously convicted of felonies involving the use or threat of violence to the person." *Spaziano v. State,* 393 So.2d 1119 (Fla.1981). On certiorari the United States Supreme Court held:

The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial.... The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. *Arizona v. Rumsey,* [467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)]. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. [Citations omitted, except] *Williams v. New York,* 337 U.S. 241, 247–249, 69 S.Ct. 1079, 1083–1084, 93 L.Ed. 1337 (1949). The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

468 U.S. at 454, 104 S.Ct. at 3161, 82 L.Ed.2d at 347. These comments were made by the Court in considering death penalty sentencing by a judge under a statute substantially similar to our statute and with findings of aggravating circumstances similar to those here. This convinces us that the Court inherently considered and rejected the premise of the Ninth Circuit in *Adamson:* that a capital sentencing statute that requires the judge to determine aggravating circumstances takes this factual element

out of the jury's hands in violation of the sixth amendment.

116 Idaho at 145–147, 774 P.2d at 315–317.

For the reasons enunciated in *Charboneau,* we hold that Lankford was not entitled to jury participation in the sentencing process.[2] Our position is strengthened by the United States Supreme Court's recent opinion in *Hildwin v. Florida,* —— U.S. ——, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) where the Court concluded that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."

## V.

### The testimony of the Court Appointed Psychiatrist.

Lankford claims that the court violated his rights guaranteed by the fifth and fourteenth amendments to the United States Constitution and Article 1, § 13 of the Idaho Constitution when it compelled him to be a witness against himself at a psychiatric examination conducted by Dr. Estes. Lankford also claims that the court's order subjected him to the psychiatric examination without assistance of counsel, thus, violating his sixth and fourteenth amendment rights under the United States Constitution, and his rights under Article 1, § 13 of the Idaho Constitution.

On May 17, 1984, the district court ordered Dr. Estes, a psychiatrist, to examine Mark Lankford and report upon his psychiatric medical condition. Dr. Estes followed the court order and questioned Lankford in the Ada County Jail. Lankford's attorney was not present during the questioning. Following his examination of Lankford, Dr. Estes submitted his findings to the court. Later he testified as to those findings at the sentencing hearing. Dr. Estes testified that, prior to interviewing Lankford, he orally administered the Miranda Rights. Dr. Estes did not obtain a written waiver of

Lankford's Miranda rights nor did he inform Lankford that his statements would be used as evidence in proving the aggravating circumstances necessary for the death penalty. Dr. Estes did advise Lankford that their conversation would not be subject to any doctor/patient privilege. Prior to allowing Dr. Estes to testify about his interview with Lankford, the trial court questioned Dr. Estes to assure that disclosure of the interview would pass constitutional muster. The court found that the examination took place with the consent and approval of counsel, after written notice to counsel, and that Lankford's comments to the psychiatrist were made voluntarily, with knowledge of his right to remain silent, and with knowledge that any statements he made could be used against him.

 The fifth amendment privilege against self-incrimination and the sixth amendment right to counsel apply to custodial psychiatric exams conducted prior to sentencing as well as those conducted prior to trial. Adequate protection of these rights requires that the examining psychiatrist Mirandize the patient. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In Estelle, after the State announced its intention to seek the death penalty, the trial court ordered a psychiatric examination to determine Estelle's competency to stand trial. The examination was conducted in the jail where he was being held. The examining doctor determined that Estelle was competent to stand trial and he was then tried and convicted. A separate sentencing proceeding was then held before a jury, as required by Texas law. The doctor who had conducted the pre-trial psychiatric examination testified for the State. The jury determined that the death penalty should be imposed. The case ultimately made its way to the federal district court by writ of habeas corpus where the death sentence was vacated because the court found constitutional error in admitting the doctor's testimony

---

**2.** Justice Huntley dissents from this Part IV and adopts his dissent in Charboneau, appended hereto as Appendix A, as his dissent in this case.

**872**

at the penalty phase. The United States Court of Appeals affirmed. The case was then appealed to United States Supreme Court which affirmed. The Court stated:

> The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The essence of this basic constitutional principle is "the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut,* 367 U.S. 568, 581–582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961) (opinion announcing the judgment) (emphasis added). See also *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596–1597, 12 L.Ed.2d 678 (1964); E. Griswold, The Fifth Amendment Today 7 (1955).

> The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967). In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made " 'the deluded instrument of his own conviction,' " *Culombe v. Connecticut, supra,* [367 U.S.] at 581, [81 S.Ct. at] 1867, quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824), it protects him as well from being made the "deluded instrument" of his own execution.

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. (Footnote omitted.) Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.

*Estelle v. Smith,* 451 U.S. at 462–463, 101 S.Ct. at 1872–1873.

■■■■■ As for the method of advising a suspect or defendant of his Miranda Rights, and of obtaining a waiver of those rights, there is no requirement that either be done in writing. The U.S. Constitution does not require a written warning or waiver, and Idaho has not required a written warning or waiver since such requirements were removed from I.C. § 19–853 in 1984. Accordingly, Dr. Estes did not violate Lankford's constitutional rights when he orally advised Lankford of his Miranda Rights and accepted an oral waiver. Since Lankford was properly Mirandized and there was no formalistic infirmity with his waiver, the only question which remains is whether Lankford's waiver was voluntary, knowing and intelligent. Lankford claims that his waiver was not voluntary, knowing and intelligent because Dr. Estes did not tell him that his disclosures could be used as evidence for the State during sentencing. We disagree. The very fact that he was Mirandized put Lankford on notice that what he said could be used against him during the sentencing hearing. This notice was furthered when Dr. Estes told Lankford that the doctor/patient privilege would not apply to Lankford's disclosures. Additionally, Lankford's attorney was involved in this process. The court sent defense counsel written notice of the court ordered psychiatric examination prior to the time it was conducted, and informed defense counsel that there was reason to believe that Lankford's mental condition would be a significant factor at sentencing. Defense counsel did not object at this point. A factor to be noted, although it is not pivotal to the outcome, is that Dr. Estes' testimony is not alleged to have presented the court with any new facts about the commission of the crime—rather the new material dealt only with psychological opinion testimony.

Because Lankford was properly informed of his rights and he voluntarily, knowingly and intelligently waived those rights and

because Lankford's attorney knew that the psychiatric examination was going to take place, the court did not err in admitting Dr. Estes psychiatric testimony at the sentencing hearing.

## VI.

### The Trial Court's Denial of Lankford's Second Motion for New Trial.

Lankford next argues that the trial court erred when it denied his second motion for new trial which was based upon newly discovered evidence and the recanted testimony of the State's key witness, Bryan Lankford.

The newly discovered evidence was a letter written by Bryan Lankford, which disclosed that he had lied when he testified that Mark had committed the murders, and that it had actually been he who committed the murders. The recantation of testimony occurred at the evidentiary hearing on Mark's second motion for new trial; Bryan testified that he had lied at Mark's trial and that his brother was not involved in the actual killings.

Mark Lankford now argues that whether this Court applies the test for granting a new trial based on newly discovered evidence or the test for granting a new trial based on recanted testimony, a new trial should be granted because the only direct evidence that linked Mark Lankford with the Bravences' murders was Bryan Lankford's original trial testimony.

We note from the outset that while the decision of whether to grant a new trial is a discretionary matter for the trial judge. Idaho Code § 19–2406(7) (1987), limits the instances in which that discretion may be exercised.[3]

**Idaho Criminal Rule 34, New Trial,** states in part: "The court on motion of a defendant may grant a new trial to him if required in the interest of justice." This Court, in *State v. Scroggins*, 110 Idaho 380, 384, 716 P.2d 1152 (1986) stated:

> The question of whether the interest of justice requires a new trial under the circumstances of a particular case is directed to the sound discretion of the trial court; and the trial court's decision thereon will not be disturbed absent an abuse of that discretion. (Citation omitted.)

Although I.C. § 19–2406 does not specifically address new trials on the basis of recanted testimony as opposed to the discovery of new evidence, the apparent intent of the legislature and opinions rendered by this Court exemplify the fact that recanted testimony is a form of new evidence and is thus covered by subsection (7). The trial judge does not abuse his or her discretion unless a new trial is granted for a reason that is not delineated in the code or unless the decision to grant or deny a new trial is manifestly contrary to the interests of justice.

As the Idaho Court of Appeals noted in *State v. Lawrence*, 112 Idaho 149, 730 P.2d 1069 (Ct.App.1986), there are two different judicial approaches to determining whether the interests of justice require that a new trial be granted on the basis of recanted testimony.

> One approach has been to treat the recantation as a form of newly discovered evidence. When a new trial is sought upon such evidence, the moving party must satisfy what has become known as the "Berry" test. This multi-part test, named after the case of *Berry v. State*, 10 Georgia 511 (1851), includes the re-

---

**3.** The portion of this code section relevant to the case at bar reads:

**19–2406. Grounds for new trial.**—When a verdict has been rendered against the defendant the court may, upon his application, grant a new trial in the following cases only:

. . . .

7. When new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and pro-

duced at trial. When a motion for a new trial is made upon the ground of newly-discovered evidence, the defendant must produce at the hearing in support thereof the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable.

quirement that the new evidence probably would produce a different result. *Berry* has been adopted in substance by most state and federal courts. 3 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 557 (2d Ed.1982) (hereinafter WRIGHT). It was approved by our Supreme Court in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976).

A second approach has been to treat recanted testimony as a problem distinct from newly discovered evidence. Perjured testimony affects the integrity of the judicial process in a way that overlooked evidence does not. WRIGHT, § 557.1. Moreover, while a rigorous standard for obtaining a second trial upon new evidence may be justified as an incentive for the parties to marshal evidence and to present it at the first trial, the parties need no such incentive to combat perjury. The seminal decision establishing a distinct test for recanted testimony is *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928). There, as in the present case, a government witness announced after trial that he had given false testimony. The *Larrison* court held that a new trial should be granted when (a) "[t]he court is reasonably well satisfied that the testimony given by a material witness is false," (b) "[t]hat without it the jury might have reached a different conclusion," and (c) "[t]hat the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." (Emphasis original.) (Footnote omitted.)

Those courts which fail to discern any functional difference between the recantation of trial testimony and the discovery of new evidence after trial applied the *Berry* test in both situations. *E.g., United States v. Krasny*, 607 F.2d 840 (9th Cir.1979) *cert. den.*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980). However, most courts now apply the *Larrison* test to recanted testimony. *E.g., United States v. Stofsky*, 527 F.2d 237 (2d Cir.1975), *cert. den.* 429 U.S. 819,

97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976); *see generally* WRIGHT, § 557.1.

In Idaho, the relationship between *Berry* and *Larrison* has not been explored thoroughly. However, our Supreme court, without mentioning *Berry* or its adoption in *Drapeau*, has cited *Larrison* with approval. In *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1986), the Supreme Court explicitly noted *Larrison's* three elements. The court then reformulated *Larrison* as follows:

> [U]nder the holding of *Larrison*, it would seem that in appropriate circumstances, where a defendant submits an affidavit by a government witness in which the witness recants his testimony and specifies in what ways he dishonestly testified and in what ways he would, if given the opportunity to testify again, change that testimony and where a defendant makes a showing that such changed testimony *may be material* to a finding of his guilt or innocence, a new trial should be held.

110 Idaho at 385, 716 P.2d at 1157 (emphasis added).

*Lawrence*, 112 Idaho at 151–152, 730 P.2d 1071–1072.

In the instant case, the trial court, upon consideration of substantial competent evidence, determined that the original testimony was correct and that the recantation was not believable. The trial court, as part of exhaustive findings and opinion on this issue, noted in part:

> It is very crucial to note that Bryan Lankford's recantation of his trial testimony was made under circumstances which raise a grave doubt as to its reliability.
>
> . . . .
>
> Based upon a review of the files and records herein as well as a consideration of the testimony given by Bryan Lankford at Defendant's second motion for a new trial, this Court is reasonably well satisfied that the testimony given by Bryan Lankford at the second motion for a new trial was false and furthermore that the testimony given by Bryan Lankford at the Defendant's trial concerning

the participation of the Defendant in the killing of the Bravences was true.

It is the opinion of this Court that it *cannot* be said that the recantation reasonably could affect the outcome of the trial. Furthermore, this Court does not conclude that evidence of the recantation would probably produce a different verdict. Finally, and based upon the foregoing, the recantation evidence does not, in the interests of justice, require that a new trial be granted.

Thus, our inquiry need go no further since the record demonstrates no manifest abuse of discretion in the trial court's denial of a new trial.

### VII.

### Imposition of the Death Sentence.

Lankford claims that the trial court imposed the death penalty arbitrarily and under the influence of passion and prejudice in direct contradiction of the strictures of I.C. § 19–2827(c)(1).

### A. Legal Principles.

 We begin our analysis of Lankford's claims by noting the following points of law. The right to due process requires an impartial trial judge. *Lopez v. Vanderwater*, 620 F.2d 1229, 1235 (7th Cir.1980). A judge may not be disqualified for prejudice unless it is shown that the prejudice is "a prejudice that is directed against the party litigant, and is of such nature and character as would render it improbable that the party could have a fair and impartial trial in the particular case pending." *Bell v. Bell*, 18 Idaho 636, 641, 111 P. 1074 (1910); *State v. Waterman*, 36 Idaho 259, 210 P. 208 (1922). The district court may properly participate in the examination of witnesses for the purpose of "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977) (quoting *United States v. Malcolm*, 475 F.2d 420, 427 (9th Cir.1973)). However, prosecutorial acts by the trial judge

may be violative of the defendant's constitutional rights.

### B. Analysis.

The following are the specific post-trial events Lankford claims evidence the trial judge's prejudicial attitude, his abandonment of his judicial role. We analyze each in turn.

1. The trial court referred to Defendant's Motion for New Trial, formal sentencing and jury determination of sentencing as *petty* motions.

 This problem has been adequately explained as being caused by an error in the transcription of the record. The court reporter mistook the word "pending" for "petty."

2. The trial court called the prosecutor as a witness in support of the state's position at Defendant's first Motion for New Trial hearing.

 Neither this allegation nor the record indicate that this was a prosecutorial or prejudicial act by the trial judge. Lankford appears to be asking that this Court infer that this was a prosecutorial action by the trial court evidencing bias. However, the record establishes that the trial court acted in the interest of clarifying testimony.

3. The trial court permitted the testimony of Dr. Estes as a court witness even though the state did not list him as a potential witness.

 Contrary to Lankford's allegation, defense counsel had ample notice that Dr. Estes might testify. Furthermore, the record does not establish that the trial court had any prior knowledge as to which party would be benefited by the testimony. We find no error on this point.

4. The trial court asked questions of Dr. Estes at sentencing in order to provide the foundation for introduction of his report.

 The trial court's questions were proper and designed to ensure that the expert's testimony was admissible. Thus,

these questions were actually asked for the protection of Lankford's rights. It should be noted that the trial judge asked Dr. Estes these questions at the sentencing hearing, not during trial. Because of this, there was no danger of interfering with the jury's determination of the case, and it was important that the judge (in addition to securing Lankford's constitutional rights), properly acquire the information necessary for sentencing. This was done without error.

5. The trial court supplemented the list of aggravating factors to be considered at sentencing *sua sponte* and refused to grant a continuance to meet the court imposed factors.

■ The appropriateness of the court considering the two additional aggravating factors is fully discussed herein in Section III, *supra*. Those aggravating factors were part and parcel of the crimes charged and the trial court's sua sponte listing of them for consideration is not evidence of a prejudicial attitude but rather constitutes the trial court's proper performance of its statutory duties.

6. The trial court sought to cross-examine Bryan Lankford at the second Motion for New Trial despite lengthy examinations by both parties. Failing to get a desired response, the district court struck the testimony of Bryan Lankford.

■ It is unfair to say that the trial court "sought to cross-examine" Bryan Lankford at the second motion for new trial. The court simply asked Bryan Lankford questions for the purpose of clarification. This was absolutely proper. As stated above, the granting of a new trial is a discretionary decision made by the trial judge. In a situation where a defendant requests a new trial because of recanted testimony, the trial court must be satisfied that the original testimony was false and that the new testimony is true if the judge is to grant a new trial. Accordingly, it is vital that the trial judge be allowed to ask questions for clarification and for the gathering of information during a hearing on a motion for new trial. The court did not err

in interrogating Bryan Lankford or in striking his testimony.

7. The trial court examined several witnesses at the Second Motion for New Trial hearing in an attempt to elicit testimony favorable to the State's position.

■ Upon reviewing the record we are not convinced that the purpose of the trial court's examination of witnesses was an attempt to elicit testimony favorable to the State's position. However, even if the motivation alleged by Lankford were true, Lankford failed to specify the exact incidents of this alleged misconduct. As a result, he asks us to do what defense counsel said in its brief we cannot do, "look into Judge Reinhardt's heart and mind to see if he was prejudiced toward the defendant or enflamed by the circumstances of the crime." We find this allegation without merit.

8. The trial court suggested witnesses and motions to the state at the Second Motion for New Trial hearing.

■ In this allegation defense counsel once again fails to identify specific points in the record to support this general allegation. Furthermore, Lankford fails to argue or establish that any prejudice resulted from these suggestions if in fact they were made.

## VIII.

### Aggravating Circumstances.

Lankford makes two arguments pertaining to the aggravating circumstances. First, Lankford argues that the aggravating circumstances set forth in I.C. § 19–2515 are unconstitutionally void for vagueness. Lankford's second argument is that even if the aggravating factors are constitutional and applicable, there was not sufficient evidence to support a finding of their existence in this case.

### A.

### Constitutionality of Aggravating Circumstances

■ Lankford asserts that the aggravating factor that "their murder was espe-

cially heinous, atrocious or cruel, manifesting exceptional depravity," is unconstitutional under *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In *Maynard*, the U.S. Supreme Court held that the aggravating circumstance of an Oklahoma death penalty statute which referred to especially heinous, atrocious or cruel murders was unconstitutionally vague pursuant to the Eighth Amendment to the United States Constitution. The Court reasoned that these aggravating factors failed to adequately inform the sentencer of what must be found in order to impose the death penalty and thereby left the sentencer with the ability to impose the death penalty in an arbitrary and capricious manner.

There is, however, an important distinction between the Oklahoma and Idaho aggravating circumstance statutes. The distinction is that Oklahoma has jury sentencing while Idaho adheres to judicial sentencing in capital murder cases. These aggravating circumstances are terms of art that are commonly understood among the members of the judiciary. As a result, the potential for inconsistent application that exists as a result of jury sentencing is eliminated where the judge sentences.

### B.

### Sufficiency of the Evidence

Lankford asserts that there was insufficient evidence to support three of the trial court's findings of statutory aggravating factors. He argues that: (1) there is insufficient evidence to support the finding that he had a propensity to commit murder and was a continuing threat to society; (2) that there was insufficient evidence of heinous, atrocious or cruel acts manifesting exceptional depravity to set this apart from other first degree murders in which the death penalty was not imposed; and (3) that there was insufficient evidence to support the court's finding that the murders exhibited an utter disregard for human life as set forth in *State v. Osborn*, 102 Idaho 405, 419, 631 P.2d 187 (1981).

The evidence was sufficient to support the aforementioned statutory aggravating factors.

█ 1. Doctor Estes' testimony that Lankford was an aggressive anti-social personality prone to violence combined with the fact that Lankford was convicted of two murders lends sufficient support to the trial court's finding that he had a propensity for violence and to commit murder.

█ 2. The brutal manner in which Lankford bludgeoned the skulls of his two victims clearly supports the trial court's finding that the murders were especially heinous, atrocious or cruel manifesting exceptional depravity.

█ 3. The manner in which the Bravences were brutally murdered together with the fact that they were killed for the mere reason that the Lankfords wanted to steal their van support the court's finding that the murders were committed with utter disregard for human life.

The record establishes that the aggravating factors were properly utilized by the court and that there was sufficient evidence to support the trial court's findings.

### IX.

### Proportionality of the Death Sentence.

█ The final argument Lankford raises on appeal is that the death sentence is disproportionate when compared to other cases in which the death penalty was or was not imposed. Lankford brings this argument pursuant to I.C. § 19–2827 which requires that all death sentences shall be reviewed by the Supreme Court of Idaho and that the Court shall specifically determine:

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have reviewed the sentence imposed and compared it with the sentences imposed in other capital cases.[4] In making the comparison we have considered: (1) the nature of, and the motive for, the crime committed; (2) the heinous nature of the

---

4. Those cases we have considered include: *State*
*v. Bryan Lankford*, 113 Idaho 688, 747 P.2d 710

crime; and (3) the nature and character of the defendant to determine whether the sentence was proportionate and just. After thoroughly examining the record and evaluating these factors, we find nothing that would indicate that the sentence of death imposed against Lankford was disproportionate or unjust. The comments this Court made relative to Bryan Lankford's sentence at 113 Idaho at 704, 747 P.2d at 726 are equally applicable to this case.

The judgment of conviction and the sentence imposed are affirmed.

BAKES, C.J., concurs.

JOHNSON, J., concurs in Parts I–VII and VIII(B), concurs specially in Parts VIII(A) and IX.

SCHWARTZMAN, J. Pro Tem., concurs in Parts I and III through IX and concurs in the result in Part II.

SHEPARD, J., sat but did not participate due to his untimely death.

SCHWARTZMAN, Judge Pro Tem., concurring specially.

I write to concur specially in Part II of the court's opinion. Assuming that Instruction No. 24(a) was and is an incorrect or misleading statement of Idaho law, I find the giving of such instruction, when viewed in the light and context of all the other instructions, as well as the undisputed factual underpinnings giving rise to this case, is harmless error beyond any and all reasonable doubt. See *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Given the fact that the jury was properly instructed on the statutory definitions of Murder, Malice and Robbery, as well as the applicable burden of proof and elements of the crime, it is inconceivable that a jury could be mislead into a "presumption" that malice is established as a matter of law from the mere fact that an unlawful killing took place during the perpetration of the crime of robbery. Moreover, this instruction can be analyzed

(1987); *State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985); *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985); *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985); *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), *cert. den.,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1982); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Stormoen,* 103 Idaho 83, 645 P.2d 317 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979); *State v. Bradley,* 98 Idaho 918, 575 P.2d 1306 (1978); *State v. Birrueta,* 98 Idaho 631, 570 P.2d 868 (1977); *State v. Allen,* 98 Idaho 782, 572 P.2d 885 (1977); *State v. Ward,* 98 Idaho 571, 569 P.2d 916 (1977); *State v. Gerdau,* 96 Idaho 516, 531 P.2d 1161 (1975); *State v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975) *cert. den.,* 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974); *State v. Hatton,* 95 Idaho 856, 522 P.2d 64 (1974); *State v. Standlee,* 96 Idaho 165, 525 P.2d 360 (1974); *State v. Foley,* 95 Idaho 222, 506 P.2d 119 (1973); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Atwood,* 95 Idaho 124, 504 P.2d 397 (1972); *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971); *State v. Gomez,* 94 Idaho 323, 487 P.2d 686 (1971); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. den.,* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970); *State v. Rodriguez,* 93 Idaho 286, 460 P.2d 711 (1969); *State v. Jiminez,* 93 Idaho 140, 456 P.2d 784 (1969); *King v. State,* 93 Idaho 87, 456 P.2d 254 (1969); *State v. Gonzales,* 92 Idaho 152, 438 P.2d 897 (1968); *State v. Chaffin,* 92 Idaho 629, 448 P.2d 243 (1968); *Carey v. State,* 91 Idaho 706, 429 P.2d 836 (1967); *State v. Koho,* 91 Idaho 450, 423 P.2d 1004 (1967); *State v. Anstine,* 91 Idaho 169, 418 P.2d 210 (1966); *State v. Gish,* 87 Idaho 341, 393 P.2d 342 (1964); *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961); *State v. Burris,* 80 Idaho 395, 331 P.2d 265 (1958); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957); *State v. Buchanan,* 73 Idaho 365, 252 P.2d 524 (1953); *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953) (considered only in terms of crime committed and penalty imposed); overruled on substantive law point in *State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971); *State v. Pettit,* 104 Idaho 601, 661 P.2d 767 (Ct.App. 1983); *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982).

as one where the predicate facts conclusively establish malice, so that no rational jury could find that the defendant committed the relevant criminal acts but did so without malice aforethought. It is also inconceivable, both as a matter of law and fact, that two innocent and helpless victims can be deliberately bludgeoned to death, one after the other, by another human being who somehow does not exhibit and possess the requisite criminal malice, either express or implied. The facts and reasonable inferences to be drawn therefrom are so overpowering and conclusive as to constitute harmless error beyond any shadow of a doubt. See and compare *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). In my opinion, Instruction 24(a) is merely superfluous; at the very worst, it simply permits the jury to infer malice from defendant's conduct.

Finally, I write to concur specifically in Part IX of this Court's opinion. The sentence imposed is directly proportional to and commensurate with the sentence imposed and affirmed in *State v. Lankford*, 113 Idaho 688 at 703, 704, 747 P.2d 710 at 725, 726 (1987). The facts of this case depict a journey into the "heart of darkness," a descent into the soul of *evil*. The Judgment of Death is proportionate to the acts committed and is civilized society's just and ultimate condemnation of the perpetrator of this evil.

JOHNSON, Justice, concurring specially.

I concur with the lead opinion and write only to comment on Parts II (Instruction No. 24A), VIII(A) (Constitutionality of Aggravating Circumstances) and IX (Proportionality).

### INSTRUCTION NO. 24A.

The felony murder provision contained in I.C. § 18–4003(d) has come down to us virtually unchanged since territorial days. In 1882 the Supreme Court of the Territory of Idaho described the policy behind felony murder and noted the role that the commission of one of the enumerated felonies plays in the proof of first degree murder:

It is competent for the legislature to prescribe what felonious homicides shall be deemed murder, and to define the degrees. It is the policy of the law to hold persons engaged in felonies, or attempts to commit felonies, responsible for all the consequences of their felonious acts, whether such consequences were definitely intended or not; *the intent to commit a felony standing in the place of the malice in ordinary cases of murder.*

*People v. Mooney*, 2 Idaho 17, 18, 2 P. 876 (1882) (emphasis added).

Under this reading of the statute, Instruction No. 24A correctly instructed the jury that proof of the perpetration or attempted perpetration of a robbery would stand in the place of malice in proving first degree murder.

Lankford attempts to persuade us that the instruction was incorrect, because in his brother's case this Court referred to the commission of the robbery as "a substitute for specific proof of premeditation." *State v. Lankford*, 113 Idaho 688, 695, 747 P.2d 710, 717 (1987); *vacated*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988); *affirmed, State v. Lankford*, 116 Idaho 279, 775 P.2d 593 (1989). A careful reading of the opinion in that case indicates that what the Court was considering there was not a distinction between malice and premeditation. Instead, the Court was considering the argument of Lankford's brother that a felony murder instruction relieved the State of proving intent. The instruction may be found in a footnote to the opinion. 113 Idaho at 694 n. 5, 747 P.2d at 716 n. 5. The Court erroneously, I believe, held that the instruction did not state "that killing in perpetration of a robbery is malice *per se.*" *Id.* at 695, 747 P.2d at 717. The Court interpreted the instruction as advising the jury "that malice can be implied in some situations." *Id.*

In my view, proof of a first degree murder under I.C. § 18–4003(d) does not require proof of premeditation or express malice. Premeditation is an element of first degree murder under I.C.

§ 18–4003(a). ("All murder ... which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.") Malice is supplied by the perpetration or attempted perpetration of one of the enumerated felonies. This conclusion is supported by *State v. Paradis*, 106 Idaho 117, 125, 676 P.2d 31, 39 (1984) and *State v. Windsor*, 110 Idaho 410, 419, 716 P.2d 1182, 1191 (1985). In *Paradis* we said:

> Under the felony murder rule, a defendant who participates in a robbery can be held liable for the death of any person killed during the commission of that robbery, regardless of the individual defendant's intent that a death occur.

Lankford challenges Instruction 24A as violating the rule of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Substantial doubt has been cast on the validity of felony murder convictions under *Sandstrom*. *E.g.*, Roth and Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L.Rev. 446, 460–471 (1985). However, as recently as June 21, 1989, the Supreme Court of Wyoming pointed out: "No jurisdiction has held that a felony murder statute violates the rule of *Sandstrom v. Montana*, ...." *Murray v. State*, 776 P.2d 206, 1989 WL 67582 (Wyo.1989).

## CONSTITUTIONALITY OF AGGRAVATING CIRCUMSTANCES.

The lead opinion upholds the constitutionality of the aggravating factor that "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," on the ground that judges, not juries, impose death sentences in Idaho. The constitutionality of this factor was upheld on other grounds in *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299, 321 (1989). We said in *Charboneau* in addressing a different issue: "Although we have upheld sentencing by district judges in death penalty cases, we are not prepared to interpret the eighth amendment to give judges more latitude than juries in making their decisions as to whether a defendant should be executed." 116 Idaho at 150, 774 P.2d at 320.

## PROPORTIONALITY OF THE DEATH SENTENCE.

While I concur with the conclusion that the sentence of death imposed against Lankford was not disproportionate or unjust compared to the sentences in other recent capital cases, I object to the rote citation of the cases we have supposedly considered. While some of the many cases cited are well known, others are inapposite and some are outdated. I particularly object to the citation of cases in which the death penalty was not at issue. *E.g.*, *State v. Stormoen*, 103 Idaho 83, 645 P.2d 317 (1982) (indeterminate life sentence based on a plea to second degree murder). Also, over half of the cases cited involve sentences that were handed down before our present death sentencing statute was enacted in 1977. For myself, I have personally reviewed the cases since 1977 that I believe are comparable to this one. I suggest that we discontinue the practice of routinely citing cases which are not in point and which are outdated.

## Appendix "A"

HUNTLEY, Justice, concurring and dissenting [in *State v. Charboneau* ].

While I support the death penalty and concur in the bulk of the majority opinion, I respectfully suggest that Idaho's present capital sentencing procedure is unconstitutional because it removes the jury from its constitutional fact-finding role. Our process violates the federal constitution for the reasons stated in *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988) and violates the Idaho Constitution for the reasons I have articulated in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983) and *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983). I will discuss each analysis in turn.

## I.

### The Jury as Fundamental to Preserving Democracy

The determination of the issue presented on appeal should be made in the context of

the history and purposes of the right to trial by jury. Our forefathers wisely provided in Article 1, Section 7 of the Idaho Constitution: "The right to trial by jury shall remain inviolate ..." They so provided because they recognized that the jury system is the single most important guardian of the people's right to be protected from oppressive and overreaching government.

Few Americans realize that the right to jury trial in civil cases has almost been lost in England. English judges, with the acquiescence of a compliant bar, have totally eliminated the right to trial by jury in civil cases, except in cases of libel or slander. The English themselves seem to have forgotten the words of their eminent jurist, Blackstone, who wrote that trial by jury is:

> ... the glory of the English law ... [i]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected in his property, his liberty, or his person but by the unanimous consent of twelve of his neighbors and equals.

Blackstone Commentaries 79.

Some American judges and legislators have similarly lost touch with the following language in our Declaration of Independence:

> [George III] has combined with others to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation: ... For depriving us, in many cases, of the benefits of trial by jury ...

The French philosopher and essayist, de Tocqueville, who understood and appreciated democracy in America with keener insight than any other observer of the Nineteenth Century, stated that the jury system in America:

> ... places the real direction of society in the hands of the governed ... and not in ... the government ... He who punishes the criminal ... is the real master of society. All the sovereigns who have chosen to govern by their own authority and to direct society, instead of obeying

its direction, have destroyed or enfeebled the institution of the jury.

Those who believe in strict construction of our Constitution recognize that the judiciary's oath to "support and defend the Constitution" requires that we resist the temptation to enhance judicial power through encroachment into the provinces constitutionally delegated to the jury.

## II.

### The Federal Right to Jury Fact Finding in Capital Cases

In *Adamson v. Ricketts*, the 9th Circuit stated the issue:

> Adamson also contends that the Arizona statutory scheme for imposing the death penalty erroneously lists elements of the offense as factors to be determined by the sentencing judge, thus depriving him of his right to a jury decision on the elements of the crime in violation of the Sixth and Fourteenth Amendments. We agree.

The Idaho sentencing procedure under I.C. § 19–2515 is virtually identical in all material respects to the defective Arizona statutory scheme. Noteworthy is the fact that Idaho and Arizona are two of only four states which have the death penalty which have taken the jury out of the fact-finding process of making the ultimate determination as to whether the death penalty is appropriate. The fact that thirty-one of the thirty-five states which have the death penalty utilize the jury in making that determination speaks volumes as to what our Anglo–American traditions and constitutions require.

As the *Adamson* court noted:

> An aggravating "circumstance" which elevates a murder to a "death-eligible" murder in the penalty phase, remarkably mirrors the attributes of an essential element of the offense during the guilt phase of a trial. Like an element of a crime, an aggravating circumstance in the Arizona scheme informs the prosecutor what facts must be proven to obtain a conviction. The circumstance must be proven beyond a reasonable doubt. The

hearing is adversarial, with oral argument and the prosecution's presentation of evidence governed by the usual rules of evidence. The presiding trial judge must make findings on the existence or nonexistence of each of the statutory aggravating and mitigating circumstances. If the judge finds an aggravating circumstance, the burden then shifts to the defendant who must put on sufficient evidence of mitigation or the death penalty will be imposed. A.R.S. § 13–703; see also *Arizona v. Rumsey*, 467 U.S. 203, 210 [, 104 S.Ct. 2305, 2309, 81 L.Ed.2d 164] (1984). If the prosecution is unable to prove the existence of a single aggravating circumstance, like not proving an essential element, the defendant cannot be put to death. Cf. *Poland v. Arizona*, [476 U.S. 147,] 106 S.Ct. 1749, 1754[, 90 L.Ed.2d 123] (1986) (Court framed the relevant [*39] inquiry as "whether the sentencing judge or the reviewing court has "decid[ed] that the prosecution has not proved its case for the death penalty and hence has 'acquitted' petitioners"); *Rumsey*, 467 U.S. at 212[, 104 S.Ct. at 2310] (where findings of fact at sentencing hearing were all favorable to defendant, he was "acquitted" of the death penalty).

Although Idaho's majority in *Charboneau*, similarly to the judiciary in Arizona and the prosecutors in both states, urge that a trial court in finding facts as to aggravating circumstances is exercising a "sentencing determination" as distinguished from finding the elements of a death-eligible murder, their use of the language in justifying that position frequently results in Freudian slips which indicate otherwise. In fact, to rule for the state's position it is necessary to do exactly what the majority did in this case, that is, engage in a circular argument, the majority reasoning 116 Idaho at page 146, 774 P.2d at page 316.

To accept Jaimi's argument that the jury must be involved in determining whether aggravating circumstances exist, we would have to conclude that the aggravating circumstances listed in I.C. § 19–2515(g) are elements of first degree murder. We are unable to reach that conclusion. *The circumstances listed in the statute are clearly circumstances to be considered in sentencing and not elements of first degree murder.* It is not unconstitutional for a judge, instead of a jury, to determine whether any of the aggravating circumstances listed in the statute exist.

The sentence I have underscored is totally circular. Of course, if one can pronounce that the circumstances are part of sentencing and not part of the elements of a death penalty crime, then they are not elements of a death penalty crime.

The plain fact is, before a person is eligible to be executed, a *finding* must be made that the aggravating circumstance existed. That finding is typically a jury finding, it was a jury function in Idaho from territorial days through 1977, and is a fact to be found by the jury in all but four of the states which have the death penalty.

It could of course be argued that my position is circular if I were to take the underscored sentence from the majority opinion, *supra*, and restate it as follows:

The circumstances listed in the statute are not circumstances to be considered in sentencing but are elements of death-eligible murder.

However, I would submit that the issue is best resolved by recognizing that it is traditional and accepted jurisprudence that every factor required to prove a crime is considered an element of that crime. One cannot be sentenced to death without the finding of the aggravating circumstances having taken place and, thus, they would appear to be essential elements of the crime rather than some less important procedural matters occurring during sentencing.

The United States Supreme Court has not passed directly upon the issue presented in this case, but what it has written about the jury and its function in death penalty cases indicates that the process would be best served by bringing the four states in line at this time.

Since the Court has held that death sentences must comport with the community's

sense of evolving standards of decency and its legitimate desire for moral retribution, an essential question is whether judges alone can reliably reflect the communal values that are the source of the constitutionality of capital punishment.

By definition, juries, not judges, are "the cross-section of the community," reflecting community values. *Duren v. Missouri*, 439 U.S. 357, 359 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979). Only a representative jury assures "meaningful community participation." *Ballew v. Georgia*, 435 U.S. 223, 235 98 S.Ct. 1029, 1036, 55 L.Ed.2d 234 (1978) (plurality opinion). Jurors, unlike judges, are selected to enhance the likelihood that they represent the whole range of community beliefs and backgrounds, *Taylor v. Louisiana*, 419 U.S. 522, 531–33, 95 S.Ct. 692, 698–699, 42 L.Ed.2d 690 (1975); the different segments of the community bring to the representative jury "perspectives and values that influence both jury deliberation and result," *id.* at 532 n. 12, 95 S.Ct. at 698 n. 12. See *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Moreover the sheer difference in size between a twelve-member jury panel and a single judge may bear significantly on the validity of a sentencing decision under the Eighth Amendment. Canvassing expert empirical studies, the United States Supreme Court has concluded that the likelihood that a decision in a criminal case correctly applies "the common sense of the community to the facts" increases with the number of decisionmakers. *Ballew v. Georgia, supra*, 435 U.S. at 232, 98 S.Ct. at 1035.[1] Twelve individuals are obviously more likely to reflect the prevailing views of society than one person.[2]

A jury need not engage in questionable speculation to determine what community sentiment would say in a particular case. Its very function is to bespeak that community sentiment by exercising its own judgment. The jury's response is society's response. *Witherspoon v. Illinois, supra*, 391 U.S. 510 at 519–20, 88 S.Ct. 1770 at 1775–1776, 20 L.Ed.2d 776 (1968). "The jury ... is a significant and reliable objective index of contemporary values because it is so directly involved," *Gregg v. Georgia, supra*, 428 U.S. 153 at 181, 96 S.Ct. 2909 at 2928, 49 L.Ed.2d 859 (1976). By contrast, judges cannot themselves speak for community sentiment. If they are to fulfill the demands of the Eighth Amendment by bringing evolving standards of decency and principles of retribution to bear in a capital punishment case, they can do so only indirectly since "[C]ourts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits." *Dennis v. United States*, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). Unable to represent community sentiment, a judge must undertake to ascertain it. That is necessarily a difficult task,[3] made

---

1. *Ballew* also amassed considerable empirical evidence to prove that reducing the number of decisionmakers in a criminal case impairs the accuracy, fairness, thoroughness and consistency of the decision, generally to the detriment of the defendant. *Ballew v. Georgia*, 435 U.S. 223, 232–39 [98 S.Ct. 1029, 1035–38, 55 L.Ed.2d 234] (1978) (plurality opinion).

2. Significantly, every state authorizing jury involvement in capital sentencing appears to require a jury of twelve persons.

3. Judges may theoretically have access to community sentiment through social contact, as well as through such sources as polls, editorials, journals, and newspaper reports. Cook, *Public Opinion and Federal Judicial Policy*, 21 Am.J. Pol.Sci. 567, 576 (1977). Unfortunately, these sources greatly overstate the willingness of members of the community to impose the death penalty on specific defendants for specific crimes. Research on jury behavior reveals that jurors are substantially more lenient when trying an actual case and sitting through deliberations than they will otherwise indicate. Aeisel & Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court*, 30 Stan.L.Rev. 491, 511–12 (1978) (shadow juries drawn randomly and not subject to peremptory challenges vote guilty far more often than real juries; probably because the defendant's liberty was not in their hands). People who favor the death penalty in the abstract are more lenient when presented with descriptions of actual cases.

even more difficult because judges—whether considered in terms of race, sex, or economic class—do not reflect the wide range of backgrounds or beliefs within the community.[4] "[T]he reluctance of juries in many cases to impose the sentence [of death] may well reflect the humane feeling that this most irrevocable sanction should be reserved for a small number of extreme cases," *Gregg v. Georgia, supra,* 428 U.S. at 182, 96 S.Ct. at 2929. For a variety of reasons, judges appear less likely to reflect that same reluctance.[5]

As a means of reliably reflecting community sentiment on capital punishment, bringing lay jurors into the sentencing process " 'places the real direction of society in the hands of the governed ... and not in ... the government.' " Powell, *Jury Trial of Crimes,* 23 Wash. & Lee L.Rev. 1, 5 (1966) quoting de Tocqueville, Democracy in America 282 (Reeve Tran.1948). Quintessentially, the right to a jury "is granted to criminal defendants in order to prevent oppression by the government," *Duncan v. Louisiana,* 391 U.S. 145, 155, 88 S.Ct. 1444,

**4.** As of 1979 judges in state courts of general trial jurisdiction earned salaries ranging from $24,000 in Oklahoma to $54,205 in California, with a mean of approximately $41,000. Nat'l Center for St. Cts., Survey of Judicial Salaries 1 (Sept.1979). As of 1977 in these general jurisdiction courts, only 2.5 percent of the 5,155 judges were women, and 20 states had no women at all on these courts. Cook, Women Judges: *The End of Tokenism, in Women in the Courts,* 84, 87–88 (Nat'l Center for St. Cts. 1978). It appears that as of 1977 only 2.6 percent of the judges on these general trial courts were black. G.W. Crockett, Number and Distribution of Black Judges (March 1977) (unpublished charts on file with Nat'l Center for St. Cts.). Finally, the rigorous educational requirements for admission to the bar make it inevitable that the average educational attainment of judges will far exceed that of the community in general.

**5.** Kalven and Zeisel's classic report shows that judges and juries disagree in a substantial number of cases. In a study of 3576 trials, judge and jury reached the same decision about a criminal defendant only 72 percent of the time. *H. Kalven & H. Zeisel, The American Jury,* 68 (1966). In their specific study of the death penalty, the authors report that judge and jury disagreed about the imposition of a death sentence in 19 percent of the cases, *id,* at 436. To view the results yet another way, in those cases where one or both recommended death, judge and jury disagreed 60 percent of the time. In those cases in which either the judge or jury or both would have voted for the death penalty, in 40 percent, judge and jury agreed, and in 40 percent only the judge would have voted for the death penalty, yet in only 20 percent of the cases would the jury but not the judge vote for execution. Thus, the juries were essentially twice as lenient as the judges. *Ibid.* As a United Nations Report concludes:

"[A]mong the leading authorities in penal science, the supporters of abolition appreciably outnumber those who favour the retention of *capital punishment. The specialists of the* social sciences, penologists, doctors and writers on social science or criminology are, in their great majority, abolitionists. The supporters of capital punishment, apart from a number of political figures and persons holding high public office, are generally jurists with a traditional training and judges."
United Nations, Dept. of Economic and Social Affairs, Capital Punishment (ST/SOA/SD/9–10–64) (1968).
The reason for these differences may lie in the greater reluctance of judges to depart from what they perceive to be the letter of the law. See, *e.g., Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Kalven and Zeisel discovered in more than one judge "a kind of envy of the freedom of the jury to reach a decision which he as a judge could not reach" *Kalven & Zeisel, supra,* at 428. The judge's role as a strict enforcer even restricts his discretion in sentencing decisions where that discretion would seem to be wholly lawful. As one judge said of draft evasion cases: "I am opposed to conscription. I also believe that the war in Vietnam is both immoral and impractical. My sentencing policies are based upon the fact that as long as law exists, it should be imposed to effectuate its intent and purpose." Cook, *Sentencing Behavior of Federal Judges:* Draft Cases —1972, 42 Cinn.L.Rev. 597, 623 (1973). At the same time, Cook's study also reveals that as judges (unlike individual jurors) accrue experience in a given type of case, their sentencing settles into distinct and regular patterns of severity or leniency, *id.,* at 602–03, so that the judge's first decision whether a person lives or dies may inspire far more deliberation and consideration than subsequent decisions. For individual jurors, however, the gravity with which they approach their decisions in capital cases will rarely be affected by such routinization.
Florida studies report that sentencing judges were significantly more inclined to impose death than the juries that recommended sentences to them. The studies also show that the judges' decisions seem to correlate with the race, sex, and social background of the defendant and victim, while the juries showed no evidence of any such biases.

1450, 20 L.Ed.2d 491 (1968), and to protect against "arbitrary action" by the compliant, biased, or eccentric judge. *Id.* at 156, 88 S.Ct. at 1451. It "reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizens to one judge or to a group of judges." *Ibid.*[6] These concerns are even more compelling where life stands immediately in the balance.

## III.

### The Idaho Constitutional Mandate

The Idaho Constitution, as first approved on July 3, 1890, and as it reads today, provides in Art. 1, § 7:

"Right to trial by jury.—The right of trial by jury shall remain inviolate...."

That right of trial by jury as it existed at the time our constitution was adopted, provided for jury participation in the capital sentencing process. Section 17 of the Criminal Practice Act of 1864 provided in pertinent part:

[A]nd the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death, and every person

guilty of murder in the second degree is punishable by imprisonment in the territorial prison for a term not less than ten years, and which may be extended to life.

Section 17 was carried over verbatim into Revised Statute § 6563 (1887) enacted two years before the adoption of the Constitution.

In other words, the jury, by determining whether the party was guilty of either first or second degree murder, determined whether or not the death penalty would be imposed.

In *Blue Note Inc. v. Hopper*, 85 Idaho 152, 157, 377 P.2d 373 (1962), we stated:

The provisions of the constitution pertaining to the right to trial by jury are construed to apply as it existed at the date of the adoption of the constitution.

*Accord. Anderson v. Whipple*, 71 Idaho 112, 227 P.2d 351 (1951); *Christensen v. Hollingsworth*, 6 Idaho 87, 53 P. 211 (1898); *Comish v. Smith*, 97 Idaho 89, 540 P.2d 274 (1975).

Idaho continued to employ the jury in the capital sentencing process during all of the intervening years until the Supreme Court of the United States struck down the death penalty statutes of most states through its 1972 decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

At the time of *Furman*, I.C. § 18–4004 read:

Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall

---

**6.** The *Proffitt* plurality's speculation that "judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury and therefore is better able to impose sentences similar to those imposed in analogous cases," *Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, must, of course, be read in the context in which it was made: as a statement of the probable result of the Florida system in which an advisory jury sentence may be mitigated at the discretion of the trial judge, or increased from life imprisonment to death only where a life sentence would be manifestly unreasonable. *Id.* at 249–50, 96 S.Ct. at 2965–2966.

Moreover, empirical evidence suggests that individual state trial judges are not likely to achieve consistency among death sentences meted out across the state. Cook, *Public Opinion and Federal Judicial Policy*, 21 Am.J.Poli.Sci. 567, 623 (1977). Rather the state can better take advantage of the purported ability of judges to ensure consistency in capital sentencing, at no cost to the defendant's right to jury sentencing, by relying on the automatic appeal procedure by which this Court must review each death sentence in comparison to other cases involving similar crimes or defendants. I.C. § 19–2827. See, *Gregg v. Georgia*, 428 U.S., at 204–06, 96 S.Ct. at 2939–2940; *id,* at 211–12, 96 S.Ct. at 2942–2943 (White, J., concurring).

be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

In its first post-*Furman* session (1973), the Idaho legislature deleted the jury function from I.C. § 18–4004 and made all convictions of first degree murder subject to the death penalty. This was done in an attempt to remove the "cruel and unusual punishment" aspects disapproved in *Furman*. I.C. § 18–4004 was amended by striking out the words as lined out below:

> 18–4004. PUNISHMENT FOR MURDER.—Every person guilty of murder in the first degree shall suffer death ~~or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted.~~ Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.

The 1973 Amendment restored the law to its 1864 standing.

After the United States Supreme Court in a series of cases declared statutes of other states which were similar to Idaho's 1973 version unconstitutional, the Idaho legislature responded in 1977 with the present statutory scheme providing for inquiry into mitigating or aggravating circumstances as set forth in I.C. § 19–2515 et seq. That amendment changed the statute back to its pre–1973 language except that it omitted restoring the jury function and added the reference to I.C. § 19–2515:

> 18–4004. PUNISHMENT FOR MURDER. ~~Every~~ Subject to the provisions of 19–2515, Idaho Code, every person guilty of murder ~~in~~ of the first degree shall ~~suffer~~ be punished by death or by imprisonment for life. Every person guilty of murder ~~in~~ of the second degree is punishable by imprisonment ~~in the state prison~~ not less than ten (10) years and the imprisonment may extend to life.

Except for four states which entirely abolished capital punishment in the nineteenth century, every American jurisdiction has at least at some time employed jury sentencing in capital cases. *McGautha v. California*, 402 U.S. 183, 200 n. 11, 91 S.Ct. 1454, 1463 n. 11, 28 L.Ed.2d 711 (1971). During a period of over a century, beginning in 1838, jurisdiction after jurisdiction that retained the death penalty replaced its mandatory capital punishment law with discretionary jury sentencing, *Woodson v. North Carolina*, 428 U.S. 280, 291–92, 96 S.Ct. 2978, 2985, 49 L.Ed.2d 944 (1976) (plurality opinion). By the time of the Furman decision in 1972, Colorado was the only state in the nation to impose capital punishment without jury involvement in the sentencing process.

Despite the long history at common law and under statutory law of the states throughout this nation of involving jury in the capital sentencing process, the Idaho legislature in the present statute enacted in 1977 totally excluded the jury from its traditional function. The legislative history shows that the legislature was not even presented with a bill which provided for jury participation. The only bill presented, was one drafted by the attorney general, Senate Bill 1082, which was presented to the legislature with the following statement of purpose:

RS 1954

S 1082

STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme court made new "rules" concerning the imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Section 18–4003 and 18–4004, Idaho Code.

Then, last year, the United States Supreme court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed.

*The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions* on capital punishment so that we will conform with this latest expression of the law. (Emphasis supplied.)

The statement of purpose is misleading insofar as it suggests that the Supreme Court decisions mandated the removal of the jury from its traditional powers and functions; the United States Supreme Court never at an earlier time or in this "latest expression of the law" required jury non-involvement.

Since jury participation in the capital sentencing process is part of the right to "trial by jury" as guaranteed inviolate by Art. 1, § 7 of the Idaho Constitution, I would reverse and remand for proper sentencing and would urge the legislature to amend the statutes to provide for proper jury participation in order that future capital punishment cases will not be subject to this serious defect.