IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No.  34192

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, January 2009 Term |
| | ) | |
| v. | ) | 2009 Opinion No.  94 |
| | ) | |
| JUAN CARLOS FUENTES PINA, | ) | Filed:  July 8, 2009 |
| | ) | |
| Defendant-Appellant. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| | ) | |

Appeal from the district court of the Fifth Judicial District, State of Idaho, Twin Falls County.  Hon. G. Richard Bevan, District Judge.

Appellant's conviction is <u>vacated</u> and this case is <u>remanded</u> to the district court for a new trial.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant.  Sara Thomas argued.

Hon. Lawrence G. Wasden, Attorney General, Boise for respondent.  Ken Jorgensen argued.

---

W. JONES, Justice

## I.  NATURE OF CASE

Appellant Juan Carlos Fuentes-Pina (Pina) appeals from his conviction of first degree felony murder following the shooting death of Jesse Naranjo by Johnny Shores.  Pina raises three issues on appeal: 1) whether the district court erred in applying the proximate cause rather than the agency theory of felony murder, 2) whether the district court erred in instructing the jury that Pina could be convicted of felony murder if "during the commission or attempted commission of the kidnapping, Jesse Naranjo was killed," and 3) whether the district court erred in denying Pina's mid-trial motion to proceed *pro se*.  Because we agree that the district court incorrectly

1

applied Idaho's felony murder rule and incorrectly instructed the jury, we vacate Pina's conviction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 29, 2005, Jesse Naranjo (Naranjo) was shot by Johnny Shores (Shores) following a dispute between Naranjo and Pina. The argument between Pina and Naranjo first started outside of the house when Naranjo arrived. According to a witness, when Naranjo exited his car, the two men exchanged words before Pina put his hands in his pockets and followed Naranjo into the house, with Naranjo repeatedly looking back at Pina. The witness speculated Pina had a gun in his hand inside the pocket at this time. Once inside, Naranjo and Pina continued to argue and Pina motioned to the floor, making Naranjo get on his knees.

Shores and his girlfriend were asleep in a nearby room when they were awakened by the argument between Pina and Naranjo. When they opened the door to see what was happening they observed Pina standing in front of the kneeling Naranjo, holding a shotgun, and speaking in an angry tone. Shores walked around Naranjo and approached Pina. As the two spoke, Pina motioned at Naranjo and then at Shores' feet, after which Naranjo bent down and kissed Shores' foot. According to Shores, he "[n]udged [Naranjo] and told him to get up," and then told Pina to give him the gun. However, another witness testified that after Naranjo kissed Shores' feet, Shores "kicked [Naranjo] in the face . . . ." According to Shores, Pina responded to Shores' request for the gun by stating, "No. F--- this fool." Shores continued to encourage Pina to give him the gun and Pina finally relented.

As Pina handed the gun to Shores, Naranjo jumped off his knees and grabbed the gun. The three men wrestled for control and Shores ultimately seized the gun. Pina and Naranjo continued to fight. Naranjo ran to the back of the house and tried to get through the back door, but Pina slammed the door on him. Shores followed behind them and at some point fired the gun.

Shores later stated he was "scared and panicked and didn't know what to do, and [he] just fired the gun." He said he did not think he had intended to fire the gun: "I don't know. I don't think—it's just like a reaction. I don't know. I was just scared. It just happened . . . I wasn't aiming." He also said it was more of a "warning shot." Naranjo was shot on the left side of his abdomen, and bled to death. Shores pled guilty to voluntary manslaughter for the death of Naranjo.

2

A grand jury indicted Pina on the charge of "felony murder," with the indictment alleging he was liable for Naranjo's death because he:

> [D]id wilfully [sic], unlawfully, and deliberately kidnap Jesse Naranjo by seizing and/or confining Jesse Naranjo with intent to cause him without authority of law to be kept and/or detained against his will and that during the course of that kidnapping, Jesse Naranjo, a human being, was unlawfully killed, to-wit: Jesse Naranjo was shot in the abdomen with a shotgun, from which he died, in violation of Idaho Code Section 18-4001, 18-4003(d).

Upon completion of the presentation of the State's case-in-chief, counsel for Pina moved, pursuant to Idaho Criminal Rule 29, for dismissal. Counsel asserted that the State had failed to present a prima facie case of felony murder because it presented no evidence indicating that the death resulted from any type of common plan or design between Pina and Shores. The State objected but acknowledged, "We don't assert that Mr. Shores was in on the plan, whatever there was, to kidnap, for whatever purposes, Mr. Naranjo at the time that Mr. Pina brought him into the house." Instead, the State asserted, "once Mr. Shores was activated, he was clearly not on the side of Jesse Naranjo. He was acting with Mr. Pina against Mr. Naranjo . . . ."

The district court denied the I.C.R. 29 motion, finding that "any killing committed in the perpetration of or attempt to perpetrate a kidnapping is murder of the first degree. Now, the question for the jury is whether this killing did in fact occur during the perpetration or attempt to perpetrate the kidnapping." The court then adopted a "stream-of-events" theory of felony murder, finding that:

> [T]he Idaho Code is very clear in that regard, and if the killing occurs, it does not, our statute does not require a killing to be by the person who initiated the kidnapping and indeed is silent as to that effect. I believe that silence leaves for this court to view this matter, not narrowly under the agency theory, but rather the decision for the jury whether the stream of events is such that this defendant should be held liable for the felony murder of Mr. Naranjo.

Defense counsel renewed the I.C.R. 29 motion during its case-in-chief, and the court again denied it, applying the "stream-of-events concept set forth previously and under the notion of felony murder in this case . . . ."

On the last day of the trial, as defense counsel conferred with Pina during the lunch hour, he took off his civilian clothing, demanded his jail clothing, and then refused to return to the courtroom. According to the deputy, Pina stated: "F--- you. I'm not going to court. Just give me my 3X jumpsuit, it's a mistrial, I want a new attorney." The court gave counsel the opportunity to meet again with Pina and "to tell him that the court is ordering him to appear."

3

Counsel returned after a short time and stated, "I visited with Mr. Pina in the jail, along with [co-counsel]. Mr. Pina declined to speak to us. I advised him of the court's order, and he indicated that he did not want to come to court." Based upon his failure to return, the court found Pina had "purposely" waived his "right and obligation to be here."

The deputy then reentered the courtroom and stated to the court: "I've been informed by the jail that he will attend and come up only if he can grab his papers and represent himself at this point." The court took a recess to consider the issue and then made an initial statement that it believed it needed to conduct an inquiry under *Faretta v. California*, 422 U.S. 806 (1975). The State then argued that the request for self-representation could be denied as having been untimely brought under *State v. Reber*, 138 Idaho 275, 61 P.3d 632 (Ct. App. 2002). After considering that case, the district court agreed with the State and denied Pina's request because it was untimely. The deputy relayed this ruling to Pina and returned to the court to report:

> I went down with the instruction that we would bring him back up, and I was informed by Sergeant Kinyon that, to inform him, that he would not be allowed to represent himself—represent himself. He was about halfway up the hall. He said, and I quote, "F--- you then, I ain't going." And I put—I asked him if he'd just step in holding five for a minute so I could inform you, and he said, "Fine," and he sits in there and refuses to go any further.

Thereafter, the trial commenced without Pina. No further witnesses were called, defense counsel rested and the State called no rebuttal witnesses. Following a recess, Pina returned to the courtroom for closing arguments.

At the jury instruction conference on June 29, 2006, defense counsel again renewed argument on the issue of insufficient evidence of agency and requested that the jury be instructed that Shores and Pina must have acted in concert with one another for Pina to be found guilty of felony murder. The district court declined to give the requested instructions on agency and instead gave the following instruction:

> In order for the defendant to be guilty of Felony Murder in the First Degree, the state must prove each of the following:
>
> 1. On or about November 29, 2005,
> 2. in the State of Idaho,
> 3. the defendant Juan Carlos Fuentes-Pina, A.K.A. Juan Pina, A.K.A. Juan Carlos Pina, kidnapped, or attempted to kidnap Jesse Naranjo, and
> 4. during the commission or attempted commission of the kidnapping, Jesse Naranjo was killed.

If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

Based on this instruction, the jury returned a verdict of guilty of first degree felony murder. Pina timely filed his appeal from the Judgment of Conviction.

## III. ANALYSIS

Pina argues that he was denied due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution, when he was convicted absent proof beyond a reasonable doubt of every fact necessary to constitute the crime of felony murder. In support of this proposition, he contends that Idaho follows the common law rule of felony murder, which requires a finding that Pina was acting in concert with Shores or in furtherance of a common object or purpose at the time Shores killed Naranjo. Pina further asserts that the district court erred in giving jury instructions that allowed the jury to convict him of felony murder under a strict liability theory. Finally, Pina contends that the court erred in denying his mid-trial motion to proceed *pro se*.

A. *Idaho applies the agency theory of the felony murder rule.*

Pina argues that he was wrongly convicted because the district court improperly applied the proximate cause rather than the agency theory of felony murder. This issue requires us to interpret the statutory language of Idaho's felony murder rule, which is rooted in common law.

> When interpreting a statute, this Court must strive to give force and effect to the legislature's intent in passing the statute. It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. When engaging in statutory construction, this Court has a duty to ascertain the legislative intent, and give effect to that intent. The Court must construe a statute as a whole, and consider all sections of applicable statutes together to determine the intent of the legislature. The Court also must take account of all other matters such as the reasonableness of the proposed interpretations and the policy behind the statute.

*Wheeler v. Idaho Dept. of Health & Welfare*, 147 Idaho 257, __, 207 P.3d 988, 994 (2009) (internal citations and quotations omitted). Once the legislature has chosen to act in an area of the common law and codify a common law rule, adopting only a portion of a common law rule, it is to be presumed that the legislature limited its adoption for a reason. See *Elec. Wholesale*

*Supply Co., Inc. v. Nielson*, 136 Idaho 814, 825, 41 P.3d 242, 253 (2001); see also *Ultrawall, Inc. v. Washington Mut. Bank, FSB*, 135 Idaho 832, 836, 25 P.3d 855, 859 (2001) ("The Court must assume that when the statute was amended, the legislature had full knowledge of the existing judicial decisions and caselaw of the state."); *Hook v. Horner*, 95 Idaho 657, 661, 517 P.2d 554, 558 (1973) ("Rules of common law are in effect in Idaho only to the extent that they are not repugnant or inconsistent with legislative enactment."); *State v. Mubita*, 145 Idaho 925, 940, 188 P.3d 867, 882 (2008) ("Unless the result is palpably absurd, this Court assumes the legislature meant what is clearly stated in the statute.").

The felony murder rule has incited much controversy and debate among legal scholars over the proper scope and application of the rule.[1] There are two theories of felony murder in the United States, including agency and proximate cause. See Leonard Birdsong, *The Felony Murder Doctrine Revisited: A Proposal for Calibrating Punishment that Reaffirms the Sanctity of Human Life of Co-Felons Who Are Victims*, 33 OHIO N.U. L. REV. 497, 499 (2007). Under the agency theory, the felony murder rule is only applied to actors who are acting in concert in furtherance of a common plan or scheme to hold each liable for a death that occurs during the perpetration of a felony, regardless of who actually fired the fatal shot.[2] Under the proximate cause theory, each actor is held responsible for the death of a person caused during the perpetration of a felony on the basis of reasonable foreseeability that the acts committed might reasonably be expected to result in death.[3] Under some interpretations of the proximate cause theory, one involved in the perpetration of a felony can be held liable for a death occurring during the perpetration of the felony even though the death was actually caused by a third person having nothing to do with the perpetration of the felony. See *State v. Oimen*, 516 N.W.2d 399, 404 (Wis. 1994) (upholding conviction under the felony murder rule when intended victim of the

---

[1] In the United States today, at least three states have abolished felony murder, including Hawaii, Kentucky and Michigan. See Martin Lijtmaer, *The Felony Murder Rule in Illinois: The Injustice of the Proximate Cause Theory Explored Via Research in Cognitive Psychology*, 98 J. CRIM. L. & CRIMINOLOGY 621, 626 (2008).

[2] A majority of states have adopted the agency theory of the felony murder rule. See, e.g., *Weick v. State*, 420 A.2d 159, 161-62 (Del. 1980); *State v. Garner*, 115 So.2d 855, 861-64 (La. 1959); *Campbell v. State*, 444 A.2d 1034, 1037 (Md. 1982); *Commonwealth v. Balliro*, 209 N.E.2d 308, 313 (Mass. 1965); *State v. Rust*, 250 N.W.2d 867, 875 (Neb. 1977); *Clark County Sheriff v. Hicks*, 506 P.2d 766, 768 (Nev. 1973); *Jackson v. State*, 589 P.2d 1052 (N.M. 1979); *State v. Oxendine*, 122 S.E. 568, 570 (N.C. 1924); *State v. Jones*, 859 P.2d 514, 515 (Okla. Crim. App. 1993); *Commonwealth v. Redline*, 137 A.2d 472, 482-83 (Pa. 1958); *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988); *Wooden v. Commonwealth*, 284 S.E.2d 811, 816 (Va. 1981).

[3] A minority of states have adopted the proximate cause theory of the felony murder rule. See, e.g., *State v. Lopez*, 845 P.2d 478, 482 (Ariz. Ct. App. 1992); *Mikenas v. State*, 367 So.2d 606, 608 (Fla. 1978); *People v. Dekens*, 695 N.E.2d 474, 475 (Ill. 1998); *Sheckles v. State*, 684 N.E.2d 201, 205 (Ind. Ct. App. 1997); *State v. Baker*, 607 S.W.2d 153, 156 (Mo. 1980); *People v. Hernandez*, 624 N.E.2d 661, 665 (N.Y. 1993).

6

underlying felony killed co-felon); *People v. Lowery*, 687 N.E.2d 973, 976 (Ill. 1997) (applying a broad interpretation of the felony murder rule to uphold conviction for felony murder where the intended victim of the armed robbery resisted and accidentally killed an innocent bystander).

The felony murder rule originally went unchallenged because when it was enacted practically all felonies were punishable by death. *People v. Aaron*, 299 N.W.2d 304, 310 (Mich. 1980). It was, therefore, "of no particular moment whether the condemned was hanged for the initial felony or for the death accidentally resulting from the felony." *Id*. at 310-311 (citing *Redline*, 137 A.2d at 476). Over the course of years, common law expanded to include within the felony murder rule a second element that imputed responsibility for a homicide that occurred during the perpetration or attempt to perpetrate certain felonies to any person participating in the underlying felony. See THE HISTORY OF THE PLEAS OF THE CROWN, 1 Hale 443 (1736) (noting that as to the culpability of one person for another's felonious acts, "the books in all the instances of this nature say, that it is murder or manslaughter in that party, that *abetted* him . . . and *consented* to the act.") (emphasis added); *R. v. Bosworth*, 99 E.R. 138-39 (1779) (holding that the felony murder rule is only properly applied where, at the instant the crime was committed, the charged perpetrators "were all of the same party, and upon the same pursuit, and under the same engagement and expectation of mutual defense and support with those that did the [crime]."); A TREATISE OF THE PLEAS OF THE CROWN, 1 East 255, 259 (1803) ("In order to make the killing, by any, murder in all of those who are *confederated together for an unlawful purpose*, merely on account of the unlawful act done or in contemplation, it must happen during the actual strife or endeavor, or at least within such a reasonable time afterwards as may leave it probable that no fresh provocation intervened.") (emphasis added).[4]

It was within this historical context that the legislature first codified, in 1864, what is now considered the Idaho felony murder rule.[5] The statute stated in relevant part: "All murder which shall . . . be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree . . . ." Cr. & P. 1864 § 17. Since 1864, the legislature has

---

[4] The felony murder doctrine was "continuously modified and restricted in England, the country of its birth, until its ultimate rejection by Parliament in 1957." *Aaron*, 299 N.W.2d at 310-11.

[5] There is no statute in Idaho that is titled "felony murder" or any version thereof. Rather, what has come to be known as the "felony murder rule" in Idaho is codified in the Homicide chapter of the Idaho Code in a section titled "Degrees of murder." See I.C. § 18-4003(d).

7

amended the statute ten times, but the substance has remained relatively unchanged.[6] The current version was adopted in 2002 and it states: "Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem, or an act of terrorism, as defined in section 18-8102, Idaho Code, or the use of a weapon of mass destruction, biological weapon or chemical weapon, is murder of the first degree." I.C. § 18-4003(d).

Under a statutory analysis construction, it is clear and unambiguous that the sole purpose of the felony murder rule as adopted by the Idaho legislature was to raise the degree of killing from second degree murder to murder of the first degree solely due to the death occurring during perpetration of the enumerated felonies. See I.C. § 18-4003(d). There is not currently, nor has there ever been, any mention in I.C. § 18-4003(d) of imputation of responsibility for a killing from the actual murderer to any person who was not a co-conspirator in the underlying felony. When the legislature codified only a portion of the common law felony murder rule, it impliedly determined that only the actual killer, or one acting jointly and in concert with the actual killer for a common purpose, may be held responsible for a killing under the felony murder rule. We will not intrude upon that legislative decision by expanding the common law rule beyond what the legislature in its wisdom chose. If the legislature chooses to expand the scope of the felony murder rule, it, rather than this Court, should do so.

---

[6] See R.S., R.C., & C.L. § 6562 (1908) ("All murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."); C.S. § 8211 (1919) ("All murder . . . which is committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."); I.C.A. § 17-1103 (1932) ("All murder . . . which is committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."); Act of February 16, 1935, ch. 24, 1935 Idaho Sess. Laws 41 ("All murder . . . which is committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary, *kidnapping* or mayhem, is murder of the first degree. All other kinds of murder are of the second degree.") (emphasis in original); Act of March 25, 1969, ch. 248, 1969 Idaho Sess. Laws 773 (adding provision defining any murder of any peace officer acting in the line of duty as first degree murder); Act of March 18, 1971, ch. 143, 1971 Idaho Sess. Laws 630, 676 (1971) (completely revising the criminal code by adopting most of the Model Penal Code); Act of March 27, 1972, ch. 336, 1972 Idaho Sess. Laws 844, 928 (repealing the 1971 criminal code revisions and reenacting the prior code, including the felony murder rule: "All murder . . . which is committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary, kidnapping or mayhem, is murder of the first degree."); Act of March 28, 1977, ch. 154, 1977 Idaho Sess. Laws 390, 391 ("Any murder committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem, is murder of the first degree."); Act of April 2, 1991, ch. 227, 1991 Idaho Sess. Laws 547 ("Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem, is murder of the first degree."); Act of March 22, 2002, ch. 222, 2002 Idaho Sess. Laws 623, 627 ("Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem, or an act of terrorism, as defined in section 18-8102, Idaho Code, or the use of a weapon of mass destruction, biological weapon or chemical weapon, is murder of the first degree.").

Moreover, our careful review of the felony murder rule in Idaho has shown that there has *never* been a felony murder case before this Court or the Court of Appeals that resulted in a person involved in the commission of a felony being held responsible for a killing caused by a third person not involved in the underlying felony. Nonetheless, the district court interpreted the felony murder rule in Pina's case as follows:

> [I.C. § 18-4003(d)] does not require a killing to be by the person who initiated the kidnapping and indeed is silent as to that effect. I believe that silence leaves for this court to view this matter, not narrowly under the agency theory, but rather the decision for the jury whether the *stream of events* is such that this defendant should be held liable for the felony murder of Mr. Naranjo.

(Emphasis added). In so stating, the district court attempted to impermissibly broaden the felony murder rule by relying on the "stream of events" concept that has been mentioned in prior felony murder cases. For example, in *State v. Hokenson*, 96 Idaho 283, 284, 527 P.2d 487, 488 (1974), this Court used the "stream of events" language when "Hokenson, armed with a homemade bomb and a knife, entered Dean's Drug Center, Lewiston, on the evening of January 13, 1972 with the intent to commit robbery. The resulting *course of events* ended with the death of Officer Ross D. Flavel." (Emphasis added). This Court applied Idaho's felony murder rule such that the killing that occurred during the attempt to commit the robbery was charged as murder in the first degree. The rule was applied in that case only for the purpose of raising the seriousness of the crime from murder in the second degree, manslaughter, or some other form of responsibility, to murder in the first degree. Thus, in *Hokenson* this Court applied the felony murder rule in its most basic original form at common law.

In *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985), this Court applied the felony murder rule to a death that occurred during the perpetration of a burglary. This Court, using the language from *Hokenson*, stated that "the victim's "death was part of a *stream of events* which began the evening Fetterly and Windsor entered [the victim's] home and ended the following day when [the victim's] possessions were removed from the home." *Id.* at 771-72, 710 P.2d at 1207-08 (emphasis added). Fetterly and his girlfriend, Karla Windsor, were charged with the murder of Sterling Grammer in the first degree because the killing occurred during the commission of a burglary by Fetterly and Windsor acting in concert for the common purpose of committing the burglary. Although the Court used the phrase "stream of events," it did not adopt the proximate cause theory of felony murder. Rather, this Court recognized that there were two accomplices

who were both involved in the common plan or scheme to burglarize the residence. The felony murder rule on an agency theory was properly applied in that case because both accomplices were involved in carrying out the underlying felony. Even though the "stream of events" language has been used to impute responsibility for a killing from the actual killer to a co-conspirator in the underlying felony, no Idaho case has *ever* used the felony murder rule to impute responsibility for a killing from the actual killer who is not involved in perpetration of the underlying felony to an individual perpetrating such felony. It was error for the district court to do so in Pina's case.

Additionally, this Court indicated in *State v. Scroggins*, 110 Idaho 380, 386, 716 P.2d 1152, 1158 (1985), that Idaho's felony murder rule requires a finding that each participant had the specific intent to commit the underlying felony: "In a prosecution for felony murder, the state is relieved of the burden of proving that a defendant had the specific intent to kill and instead need only prove that *all* individuals charged as principals had the *specific intent* to commit the predicate felony." (emphasis added).

Up to this point, neither the legislature, nor the judiciary, has ever applied the proximate cause theory of the felony murder rule in Idaho. As we stated above, when the legislature codified only a portion of the common law felony murder rule, it impliedly determined that only the actual killer, or one acting jointly and in concert with the actual killer for a common purpose, may be held responsible for a killing under the felony murder rule. Thus, we hold that Idaho applies the agency theory of the felony murder rule. Any change of that rule lies in the province of the legislature. There was no basis in law to support the district court's decision to apply the proximate cause theory of the felony murder rule in Pina's case.

B. *The jury instructions given by the district court constitute reversible error.*

Pina next argues that the district court erred when it gave jury instructions that allowed the jury to convict Pina under what amounts to a strict liability theory. "The propriety of jury instructions is a question of law over which this Court exercises free review." *State v. Young*, 138 Idaho 370, 372, 64 P.3d 296, 298 (2002). "When reviewing jury instructions, this Court must first ask whether the instructions as a whole, and not individually, fairly and accurately reflect the applicable law. To be reversible error, instructions must have misled the jury or prejudiced the complaining party." *Id.* (citations omitted).

As noted above, the jury instructions given by the district court read as follows:

In order for the defendant to be guilty of Felony Murder in the First Degree, the state must prove each of the following:

1. On or about November 29, 2005,

2. in the State of Idaho,

3. the defendant Juan Carlos Fuentes-Pina, A.K.A. Juan Pina, A.K.A. Juan Carlos Pina, kidnapped, or attempted to kidnap Jesse Naranjo, and

4. during the commission or attempted commission of the kidnapping, Jesse Naranjo was killed.

If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

Pina argues that the court erred in giving this overly broad jury instruction because it permitted the jury to find Pina liable for *any* killing that occurred contemporaneously with the kidnapping. For example, had Naranjo suffered a fatal heart attack during the commission or attempted commission of the kidnapping, or was struck by lightning, the jury instructions given by the district court would have allowed the jury to find Pina guilty of first degree felony murder. Indeed, this instruction did not even require that the killing be foreseeable. It therefore is defective even under the proximate cause theory of felony murder as followed in a minority of states. We agree that the district court erred in giving these instructions to the jury because the instructions as a whole fail to accurately reflect the applicable law and prejudiced Pina.

The district court's jury instruction allowed the jury to convict Pina of felony murder regardless of the fact that Pina's felonious act of kidnapping Naranjo, and Shores' homicidal act of shooting Naranjo, were not part of a common scheme or plan. It is significant that the State admitted during trial: "We don't assert that Mr. Shores was in on the plan, whatever there was, to kidnap, for whatever purposes, Mr. Naranjo at the time that Mr. Pina brought him into the house." The district court's decision to use a strict liability theory in the jury instructions was an impermissible application of the felony murder rule. Such a strained application was not what the legislature intended when it enacted I.C. § 18-4003(d). Accordingly, we hold that the district court committed reversible error when it instructed the jury.

C. *We do not reach the issue of Pina's motion to proceed* pro se.

Pina also argues that the district court erred in denying his mid-trial motion to proceed *pro se* because the court did not conduct a proper inquiry under *Faretta*. Because we vacate Pina's conviction on other grounds, we do not reach this issue.

## IV. CONCLUSION

Today we reaffirm that the Idaho legislature intended that the agency theory, rather than the proximate cause theory, of felony murder applies in Idaho. Thus, we hold that Pina was wrongly convicted of first degree felony murder because the district court appears to have attempted to apply the proximate cause theory in his case, but the instruction given by the court failed even to properly state the requirements of that theory. Accordingly, Pina's conviction is vacated, and this case is remanded to the district court for a new trial.

Justice *pro tem* KIDWELL, **CONCURS.**


Justice J. JONES, concurring in the result and in Part III.B of the Court's opinion and further concurring in Parts I and III of the dissenting opinion.

I write separately because I concur in the dissenting opinion's analysis of the felony murder rule in Idaho, as set out in Part I, and agree that the stream of events or proximate cause theory is applicable in this case. However, I concur with the conclusion in Part III.B of the Court's opinion that the jury instruction given by the district court on the felony murder issue constituted reversible error. The Court correctly states the instruction "is defective even under the proximate cause theory of felony murder." Thus, I agree that the conviction must be vacated and the case remanded for a new trial wherein the jury is to be properly instructed based upon the stream of events/proximate cause theory.


Justice BURDICK, dissenting.

I respectfully dissent and, for the following reasons, would affirm Pina's conviction.

## I. Felony murder pursuant to I.C. § 18-4003(d).

Pina first contends that the State failed to present any evidence to support a finding that he was acting in concert with Shores when Shores killed Naranjo. Therefore, he was convicted absent proof beyond a reasonable doubt of every fact necessary to constitute the crime of felony murder. I find that the State presented sufficient evidence for Pina's conviction of first degree felony murder pursuant to I.C. § 18-4003(d).

"The Due Process Clause of the United States Constitution precludes conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which a defendant is charged." *State v. Romero-Garcia*, 139 Idaho 199, 204, 75 P.3d 1209, 1214 (Ct. App. 2003). Pina was charged and convicted under I.C. § 18-4003(d), which states:

> Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem, or an act of terrorism, as defined in section 18-8102, Idaho Code, or the use of a weapon of mass destruction, biological weapon or chemical weapon, is murder of the first degree.

Pina's felony murder charge was based on the underlying felony of kidnapping. Upon completion of the presentation of the State's case-in-chief, Pina moved, pursuant to Idaho Criminal Rule 29, for dismissal, asserting that the State had failed to present a prima facie case of felony murder. The district court denied the I.C.R. 29 motion, finding that "any killing committed in the perpetration of or attempt to perpetrate a kidnapping is murder of the first degree. Now, the question for the jury is whether this killing did in fact occur during the perpetration or attempt to perpetrate the kidnapping." Therefore, the court determined the state had presented evidence sufficient to sustain a conviction of felony murder. *See* I.C.R. 29(a).

I agree, and find that a defendant may be criminally liable for the death of any person killed during the perpetration of a felony provided for in I.C. § 18-4003(d) when that murder is the natural and probable consequence of the defendant's unlawful acts. The defense argues that Idaho does not follow a proximate cause approach, relying on its contention that I.C. § 18-4003(d) is a codification of the common law in existence at the time of its adoption. I do not find this argument to be persuasive proof that Idaho has adopted an agency theory of felony murder. The Court's previous treatment of felony murder in general provides guidance on the evolution of our felony murder law. First, in examining and defining the plain language of I.C. § 18-4003(d), this Court has stated that "[t]he word 'perpetration' is synonymous with the word 'commission,' which means 'the act of committing, performing, or doing (as a crime, misdeed, or other offense).'" *State v. McLeskey*, 138 Idaho 691, 698, 69 P.3d 111, 118 (2003) (quoting *Webster's Third New International Dictionary* 1684 (Philip Babcock Gove ed., G. & C. Merriam Co. 1971)). Thus, the plain language of I.C. § 18-4003(d) indicates that any murder committed in the commission of kidnapping is murder of the first degree.

The language in I.C. § 18-4003(d) has remained largely unchanged since Idaho's territorial days. *State v. Lankford*, 116 Idaho 860, 879, 781 P.2d 197, 216 (1989). The first Idaho case to address the policy behind the felony murder rule stated: "It is the policy of the law to hold persons engaged in felonies, or attempts to commit felonies, responsible for all the consequences of their felonious acts, whether such consequences were intended or not…." *People v. Mooney*, 2 Idaho 24, 2 P. 876 (1882).

This policy of holding a person committing a felony criminally liable for "all the consequences" of his felonious acts was reiterated, and somewhat restricted, by this Court in *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974). In *Hokenson* we stated: "A person is criminally liable for the natural and probable consequences of his unlawful acts as well as the unlawful forces set in motion during the commission of an unlawful act." 96 Idaho at 288, 527 P.2d at 492. This was the first introduction of Idaho's "stream of events" approach to felony murder under I.C. § 18-4003(d). In *Hokenson*, the defendant entered a store with a bomb and a knife with the intent to commit robbery, but he was met with resistance and eventually placed under arrest. *Id*. at 287-88, 527 P.2d at 491-92. One of the responding officers was then killed when handling the bomb the defendant had brought into the store. The Court found that the defendant had "voluntarily set in motion an instrumentality which carried a very real probability of causing great bodily harm," and even the intervening force of the defendant's arrest did not allow him to escape liability for felony murder. *Id*. at 288, 527 P.2d at 492.

The "stream of events" language was then used in *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985) and *State v. Pratt*, 125 Idaho 546, 873 P.2d 800 (1993). Both cases were concerned with the temporal issue of a felony that occurred prior to the actual murder, and both involved defendants that were either co-felons or the principal actor. In *Fetterly*, this Court found that the victim's death was "part of a stream of events which began the evening [the defendant] entered [the victim]'s home and ended the following day when [the victim]'s possessions were removed from the home." 109 Idaho at 771-72, 710 P.2d at 1207-08. Similarly, in *Pratt*, the Court stated that the victim's death had been "part of the stream of events" that began when the defendant and his brother entered a residence for the purpose of stealing money, continued through a chase, and ended the following day when they finally surrendered to the police after killing one of the officers. 125 Idaho at 558, 873 P.2d at 812.

14

Furthermore, the Idaho Court of Appeals has used language that allows for the liability of anyone involved in the initial felony if that felony itself leads to death:

> Any murder committed during the perpetration of certain felonies … is murder in the first degree under § 18-4003(d). Any participant in the predicate felony can be held accountable for first degree murder for any death that occurred during the commission of the felony, regardless of whether that individual directly participated in the killing or expected or intended a death to occur.[7]

*State v. Eby*, 136 Idaho 534, 539, 37 P.3d 625, 630 (Ct. App. 2001). In *Eby*, the defendant, along with two others, robbed and murdered the victim, and the defendant was convicted of first degree felony murder. The language from *Eby* follows the stream of events approach in that so long as an individual has the intent to participate in the predicate felony, he can be criminally liable for any death occurring during the commission of that felony. This Court also stated in *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985) that, under I.C. § 18-4003(d), "a defendant who participates in a felony can be held liable for the death of any person killed during the commission of the felony, regardless of the individual defendant's intent that a death occur." 110 Idaho at 419, 716 P.2d at 1191.

It is well established that the intent requirement for first degree murder is satisfied by the commission of the underlying felony:

> [P]roof of a murder in the first degree is established in all of its elements by proving (a) the unlawful killing of a human being (b) in the course of a robbery. The requirement of "malice aforethought" is satisfied by the fact the killing was committed in the perpetration of a robbery.

*State v. Lankford*, 116 Idaho 860, 866, 781 P.2d 197, 203 (1989). The defendant need only have the specific intent to commit the predicate felony, not the homicide. In *State v. Cheatham*, 134 Idaho 565, 6 P.3d 815 (2000), this Court addressed a situation where the actors may not have formed the intent to commit the felony prior to the homicide. The Court stated:

> If the State cannot prove Cheatham and Duyungan intended to rob [the victim] by taking his property against his will prior to the commission of the homicide, then

---

[7] The court laid forth this standard in a discussion on hearsay evidence, finding that there was overwhelming evidence implicating the defendant in the underlying felony, therefore a jury would have found him guilty on the felony murder theory even without the hearsay. *Id.*

the homicide and the taking of [the victim]'s property would not be part of the same general criminal occurrence and Cheatham and Duyungan could not be convicted of felony murder.

*Id*. at 571, 6 P.3d at 821. Where the intent to commit the felony was present at the time of the homicide, the homicide is considered part of the same general criminal occurrence. In addition, similar language was used in a 1985 Idaho Supreme Court case: "In a prosecution for felony-murder, the state is relieved of the burden of proving that a defendant had the specific intent to kill and instead need only prove that all individuals charged as principals had the specific intent to commit the predicate felony." *State v. Scroggins*, 110 Idaho 380, 386, 716 P.2d 1152, 1158 (1985).

Therefore, where the defendant had the specific intent to commit the underlying felony, he is criminally liable for the death of any person killed in the perpetration of the felony when that murder is the natural and probable consequence of his unlawful acts. It should be noted that some past Idaho case law has simply stated that a person is criminally liable for any death that occurs during the commission of the felony, with no limitation provided, and I find this liability too expansive. *See State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1986); *State v. Eby*, 136 Idaho 534, 539, 37 P.3d 625, 630 (Ct. App. 2001). However, our other case law provides a proximate cause limitation to this rule. *See State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985); *State v. Pratt*, 125 Idaho 546, 873 P.2d 800 (1993). To allow an individual to be criminally liable for any death occurring in the commission of a felony would be an expansion of our felony murder law.

The Illinois Supreme Court decided a case very similar to the one currently before us in *People v. Lowery*, 687 N.E.2d 973 (1997). The facts of *Lowery* were as follows:

In his statement to the police officers, defendant explained that he and his companion, "Capone," planned to rob Maurice, Marlon, and Robert. As Maurice, Marlon, and Robert walked along Leland Avenue in Chicago, defendant approached them, pulled out a gun and forced Maurice into an alley. Capone remained on the sidewalk with Robert and Marlon. Once in the alley, defendant demanded Maurice's money. Maurice grabbed defendant's gun and a struggle ensued. Meanwhile, Capone fled with Robert in pursuit. Marlon ran into the alley and began hitting defendant with his fists. As defendant struggled with

16

Maurice and Marlon, the gun discharged. The three continued to struggle onto Leland Avenue. Upon pushing Maurice down, defendant noticed that Maurice now had the gun. Defendant then ran from the place of the struggle to the corner of Leland and Magnolia Avenues, where he saw two women walking. As he ran, he heard gunshots and one of the women scream.

*Id*. at 975. The court first stated that it would adhere to the proximate cause theory of felony-murder: "A felon is liable for those deaths which occur during a felony and which are the foreseeable consequence of his initial criminal acts." *Id*. at 977-78. The court found that the defendant's attempted robbery set in motion the events that lead to the victim's death and it was "unimportant that defendant did not anticipate the precise sequence of events that followed his robbery attempt" because his "unlawful acts precipitated those events, and he [was] responsible for the consequences." *Id*. at 978.

Here, the jury could reasonably find that Pina had the specific intent to commit the predicate felony of kidnapping. A witness observed Naranjo exiting his car with Pina following him into the house, and the witness testified that Pina acted consistently with having a gun in his hand inside his pocket. Pina was then seen to motion Naranjo to the floor after they got inside the house while they argued. Pina had a gun in his hands and when Shores asked him to hand over the gun, Pina replied "No. F--- this fool." After the struggle for the gun, Pina tried to stop Naranjo from exiting the house. Based upon the testimony the jurors heard, they could reasonably have concluded that Pina was detaining Naranjo against his will, and had the intent to kidnap or even kill Naranjo.

Then, similarly to the facts in *Hokenson* and *Lowery*, Naranjo's death occurred as part of the stream of events "set in motion during the commission" of the kidnapping by Pina. Shores's intent at this time was irrelevant. When Pina held Naranjo at gunpoint he "set in motion an instrumentality which carried a very real probability of causing great bodily harm," similar to the bomb in *Hokenson*. Even with the intervening force of Shores gaining control of the gun, Pina continued to attempt to detain Naranjo against his will, preventing him from leaving through the backdoor. Thus, it does not matter whether Pina "directly participated in the killing or expected or intended a death to occur" because the murder occurred during the commission of the predicate felony and was the natural and probable consequence of this kidnapping. Therefore, I would affirm Pina's conviction.

17

## II. The jury instruction was proper.

Pina next argues that the district court erred when it gave jury instructions that allowed the jurors to convict under a strict liability theory because the instructions misled the jury and prejudiced Pina by affirmatively misstating the law. "The propriety of jury instructions is a question of law over which this Court exercises free review." *State v. Young*, 138 Idaho 370, 372, 64 P.3d 296, 298 (2002). "When reviewing jury instructions, this Court must first ask whether the instructions as a whole, and not individually, fairly and accurately reflect the applicable law. To be reversible error, instructions must have misled the jury or prejudiced the complaining party." *Id*. (citations omitted).

The jury instruction Pina contends allowed the jurors to convict him under a theory of strict liability read as follows:

> In order for the defendant to be guilty of Felony Murder in the First Degree, the state must prove each of the following:
>
> 1. On or about November 29, 2005,
>
> 2. in the State of Idaho,
>
> 3. the defendant Juan Carlos Fuentes-Pina, A.K.A. Juan Pina, A.K.A. Juan Carlos Pina, kidnapped, or attempted to kidnap Jesse Naranjo, and
>
> 4. during the commission or attempted commission of the kidnapping, Jesse Naranjo was killed.
>
> If any of the above has not been proved beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

Pina argues that the court erred in giving this instruction because it not only allowed the jury to convict him regardless of whether the killing was attributable to him through an agency theory of liability, but it also allowed the jury to find him liable for any killing that occurred contemporaneously with the alleged kidnapping, even in the absence of any relation between the two acts.

Pina's argument fails on both grounds. First, as discussed above, the court was not required to instruct the jury that it had to find Pina was acting in concert with Shores or in

furtherance of a common object or purpose, because this is not the law in Idaho. Furthermore, the instruction did not allow Pina to be convicted for *any* killing that occurred contemporaneously with the kidnapping. Instead, the instruction specified that it was the killing of Jesse Naranjo during the kidnapping that the jury was to consider. The jury had knowledge that Shores had pled guilty to voluntary manslaughter for the death of Naranjo and that the "killing" referred to was the murder of Naranjo by Shores. This instruction properly reflected the law and, therefore, did not mislead the jury or prejudice Pina.

### III. Pina's midtrial request to proceed pro se was properly denied.

As I would affirm the conviction, I will address Pina's contention that his request to proceed pro se was wrongfully denied. Pina's final argument is that the district court erred in denying his midtrial motion to proceed pro se without conducting a proper *Faretta* inquiry. The United States Supreme Court held in *Faretta v. California*, 422 U.S. 806, 819-20 (1975) that the Sixth Amendment guarantees criminal defendants the right to proceed pro se. In *Faretta*, the Supreme Court found that the right to self-representation is implied by the structure of the Sixth Amendment: "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 422 U.S. at 819. However, the Supreme Court recognized that "the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel." *Id*. at 832. Therefore, the Supreme Court held that that an accused must "knowingly and intelligently" relinquish the benefits associated with the right to counsel. *Id*. at 835. Thus, while a defendant "need not have a valid reason for seeking to act as his own attorney any more than he or she needs a valid reason to exercise any other constitutional right," *State v. Hoppe*, 139 Idaho 871, 875, 88 P.3d 690, 694 (2003)[8], a *Faretta* inquiry generally must be conducted to ensure that the defendant is aware of the dangers and disadvantages of self-representation. *See Faretta*, 422 U.S. at 835; *State v. Lankford*, 116 Idaho 860, 865, 781 P.2d 197, 202 (1989).

However, the *Faretta* right to self-representation is not absolute. *Martinez v. Court of Appeal*, 528 U.S. 152, 161 (2000). To preserve the right to self-representation, "a defendant must make a timely and unequivocal request for self-representation which is not a tactic to

---

[8] In *Hoppe*, the Court found error in the district court's *pre-trial* denial of the defendant's motions for self-representation. It is, therefore, distinguishable from the case before this Court now.

secure delay." *U.S. v. Smith*, 780 F.2d 810, 811 (9th Cir. 1986). In *Faretta*, the facts of the case stated that the defendant had "*clearly and unequivocally* declared to the trial judge that he wanted to represent himself and did not want counsel." 422 U.S. at 835 (emphasis added). The request had also been made weeks before the trial. *Id*. When a defendant's motion to proceed pro se is not timely and unequivocal, the granting or denial of the motion is left to the discretion of the trial court. *State v. Stenson*, 970 P.2d 1239, 1274 (Wash. 1997).

First, a defendant's request for self-representation is timely if made before meaningful trial proceedings have begun. *Smith*, 780 F.2d at 811; *see also People v. Burton*, 771 P.2d 1270, 1275 (Cal. 1989) ("It is within the court's discretion to deny a motion made before the jury is impaneled if the court finds the motion is made for the purpose of delay."). In *State v. Reber*, 138 Idaho 275, 61 P.3d 632 (Ct. App. 2002), the court of appeals stated:

> A motion for self-representation is timely if made prior to the commencement of meaningful trial proceedings. Empanelment of a jury is a meaningful trial proceeding; thus, a motion for self-representation after jury empanelment is untimely. Where the request for self-representation is untimely, it nevertheless may be granted in the trial court's discretion. We, therefore, review the trial court's denial of an untimely motion for self-representation under an abuse of discretion standard.

*Id*. at 277-78, 61 P.3d at 634-35 (citations omitted). In *Reber*, the court of appeals found that the district court did not abuse its discretion in denying the defendant's motion for self-representation made after jury empanelment, even though the court had not expressed its rationale for the denial. *Id*. at 278, 61 P.3d at 635. In contrast to the defendant in *Reber*, the defendant in *Faretta* had made his request for self-representation weeks before the trial had begun. 422 U.S. 806, 835 (1975). The requirement that the defendant make a timely request "serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice." *People v. Horton*, 906 P.2d 478, 504 (Cal. 1995). Thus, the trial court is granted discretion in denying motions to proceed pro se that were not timely made.

Second, the request to proceed pro se must be unequivocal "[t]o protect defendants from making capricious waivers of counsel and to protect trial courts from manipulative vacillations by defendants regarding representation." *State v. Stenson*, 970 P.2d 1239, 1275 (Wash. 1997).

The Supreme Court in *Faretta* acknowledged this concern: "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." 422 U.S. at 834 n.46. In *Stenson*, the defendant made a motion to represent himself when the trial court denied his motion for new counsel. 970 P.2d at 1275. The Washington Supreme Court found the defendant's request to be equivocal based on the record as a whole, including the following exchange:

> THE COURT: As to a motion to represent yourself at this point in the trial, as I have indicated, certainly you have a constitutional right to do that if a motion is timely made. At this point in time I find that that motion is not timely made and *I also find based upon your indications that you really do not want to proceed without counsel*.
>
> DEFENDANT: But likewise I do not proceed [sic] with counsel that I have.
>
> THE COURT: I understand that. Based upon those considerations, I'm going to deny the motion to allow you to proceed pro se.

*Id.* (emphasis in original). Requiring that a defendant make an unequivocal request to proceed pro se allows the trial court "to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel." *United States v. Bush*, 404 F.3d 263, 271 (4th Cir. 2005). The right to self-representation cannot be used as a subterfuge to delay or "for disruption, for distortion of the system, or for the manipulation of the trial process." *Edwards v. Commonwealth*, 644 S.E.2d 396, 400 (Va. Ct. App. 2007) (citing *United States v. Frazier-El*, 204 F. 3d 553, 558 (4th Cir. 2000)). Therefore, to protect the dignity of the courtroom, a defendant's request to proceed pro se must be unequivocal.

Here, Pina's request to proceed pro se was not timely nor unequivocal. Similarly to *Reber*, meaningful trial proceedings had commenced before Pina made his request and it was therefore not timely. Not only had meaningful trial proceedings commenced, they were nearing a close. Following Pina's decision to not return to court, both defense counsel and the State rested and the court recessed before closing arguments were to begin. While the district court did not express its rationale for the denial of Pina's motion other than to recognize it as untimely, the stage of the proceedings was undeniably meaningful and the district court acted within its discretion in denying Pina's untimely motion to proceed pro se.

In addition, Pina's motion for self-representation was equivocal and a clear example of the need "[t]o protect defendants from making capricious waivers of counsel and to protect trial courts from manipulative vacillations by defendants regarding representation." Similarly to *Stenson*, Pina's request was not equivocal enough to allow the court to determine if it was a sincere request or an effort to delay or disrupt the proceedings. Based upon the deputy's account of Pina's refusal to come back to the courtroom, Pina had become very angry with his counsel, stating "F--- you. I'm not coming to court. Just give me my 3X jumpsuit, it's a mistrial, I want a new attorney." The court then requested that defense counsel inform Pina that the court was ordering him to appear and indicated that it viewed Pina's behavior as an effort to disrupt the proceedings when it stated "if a defendant purposefully refuses to come to the proceedings, we will not allow him to dictate what goes on with the case." After the court had determined to proceed without Pina, the deputy returned and stated that Pina had agreed to come to the courtroom but only "if he can grab his papers and represent himself at this point."

The court determined that Pina would not be allowed to represent himself because the request was untimely. The deputy informed Pina of the court's decision and reported:

> I was informed … to inform him, that he would not be allowed to represent himself—represent himself. He was about halfway up the hall. He said, and I quote, "F--- you then. I ain't going." And I put—I asked him if he'd just step in holding five for a minute so I could inform you, and he said, "Fine," and he sits in there and refuses to go any further.

However, Pina then returned to the courtroom before closing arguments commenced. Defense counsel informed the court that Pina intended to be present during the remainder of the trial. Pina then informed the court that he had been concerned that another case pending against him was going to be brought up and would be prejudicial. The court assured him that the only charge the jury would be considering was the felony murder charge and the lesser included offense of false imprisonment. Thus, Pina indicated that he had refused to come to the courtroom because he believed he was being charged with another crime.

Examining the record as a whole, I find that Pina's request for self-representation was not made as a result of a sincere desire to dispense with the benefits of the right to counsel and instead was an effort to disrupt or manipulate the proceedings. In its Memorandum Decision and Order, the district court stated that Pina's "request was also reported as an ultimatum, presenting

the court with the predicament of either allowing a criminally charged defendant to represent himself in the last hours of his first degree murder trial, or the defendant would refuse to appear." Therefore, I find that the district court did not abuse its discretion in denying Pina's midtrial motion to proceed pro se because it was equivocal and untimely.

For the forgoing reasons, I would affirm the conviction for first degree murder.

Justice HORTON **CONCURS.**